STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ANGELO RALPH CONTURSI, DEFENDANT-RESPONDENT.

Argued October 19, 1964—Decided May 4, 1965.

Mr. *Peter Murray,* Assistant Prosecutor of Essex County, argued the cause for appellant (*Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney).

Mr. *Joseph S. Accardi* argued the cause for respondent.

The opinion of the court was delivered by

HALL, J. The defendant's conviction for bookmaking, *N. J. S.* 2A:112–3, was reversed by the Appellate Division and a new trial ordered on the ground that the betting slips found on his person and admitted in evidence against him

were obtained by an illegal search and seizure. We granted certification on the State's petition. 42 *N. J.* 291 (1964).

No search or arrest warrant having previously issued, the vital question is whether the search was incidental to a lawful arrest, which depends, in turn, on the arresting officer's having probable cause to believe that the crime was being or had been committed by the defendant. This was raised, in accordance with the prescribed practice, by defendant's motion in advance of trial to suppress the seized evidence. *R. R.* 3:2A–6(a). The prosecution presented the testimony of the arresting officer who detailed the circumstances in line with its burden to establish validity in the case of a warrantless search in this type of situation. *Cf. State v. Scrotsky*, 39 *N. J.* 410, 412 (1963); *State v. Naturile*, 83 *N. J. Super.* 563, 569 (*App. Div.* 1964). The defendant did not testify and offered no proof whatever. The judge found probable cause on the uncontradicted evidence and denied the motion.

At the trial of the indictment before a different judge, the State's proofs consisted of essentially the same testimony offered on the motion plus expert identification and interpretation of the seized slips as recorded bets on horse races. In addition, there was police testimony that the defendant, upon being asked after his arrest what he was doing with the slips (which were not established as being in his handwriting), shrugged his shoulders and replied, "What can I say?" When the slips were offered in evidence, the motion to suppress was renewed and very properly rejected summarily. The defendant did not take the stand and presented no evidence in his behalf.

Before the Appellate Division, the defendant urged not only the invalidity of the search, but also contended that his motion for acquittal at the end of the State's case should have been granted even if the seizure were legal. The argument was that the proofs, circumstantial in nature, were consistent with an hypothesis of innocence that he was a mere bettor, notwithstanding the conceded availability also of the inference that he was a bookmaker. The Appellate Division

did not reach the point, but we need comment only that the thesis is unquestionably erroneous, *State v. Fiorello*, 36 *N. J.* 80 (1961), *cert.* denied 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed.* 2d 396 (1962), and that the prosecution's evidence in its entirety, giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, was clearly sufficient to raise a jury question and, standing unrefuted, for the jury to find guilt. *State v. Romeo*, 43 *N. J.* 188, 207–208 (1964), *cert.* denied 379 *U. S.* 970, 85 *S. Ct.* 668, 13 *L. Ed.* 2d 563 (1965); *State v. Fiorello, supra,* 36 *N. J.,* at *pp.* 90–92; *State v. O'Shea,* 16 *N. J.* 1, 4 (1954). Since that evidence, however, developed entirely from the circumstances of the seizure and its fruits, we are returned to the matter of the legality of the search as the decisive question.

The State's witness on the motion to suppress was an experienced police officer, Lieutenant Manghisi, supervisor of the plainclothes squad of the Second Precinct in the City of Newark. He testified that on the day in question, he and three other detectives were on routine patrol in an area of the precinct in which complaints of gambling activity had been received. This routine activity consisted of inspections of taverns, luncheonettes, and certain other places that were under investigation and surveillance for suspected gambling. One of these places was Holly's restaurant or luncheonette, although there was no complaint specifically directed toward this establishment. He and a colleague entered the place.[1] Noticing the door of one of the two pay telephone booths was closed, he walked to it. The light in the booth was on and he recognized the seated occupant as the defendant. He said that he knew Contursi by sight, and was aware that his squad had recently arrested him as a participant in a dice game. He

---

[1] At the trial of the indictment the officer expanded on this inspection procedure: "If I may say, it's just a form of harassment and suppression that we use in combating this type of offense. We go to places to keep people off balance that way by going in and checking them out."

further testified that he had been told by informers who had been reliable in the past that the defendant could possibly be involved in horse race gambling activities in the area.

The lieutenant went on to say that when he first observed the defendant in the booth, he was talking on the phone and had a piece or pieces of paper in one hand. He could not hear the conversation nor could he see what was on the paper. When Contursi saw the officer looking at him from outside the booth, he stopped talking, hung up the receiver and slipped the hand which had been holding the paper under his left thigh between his leg and the booth seat. He then stood up, at the same time opening the booth door and sliding the hand which had been between his leg and the seat into his pants pocket. When he came out of the booth, he pulled this hand out of his pocket and both hands were empty. The lieutenant immediately ordered him to empty his pockets, which produced the five slips identified at the trial as a record of race bets as well as $73 in currency. He was then taken to the precinct headquarters and charged with bookmaking.

As has been indicated, the motion judge decided in the State's favor on the motion to suppress. Pursuant to his obligation whether the proofs be in conflict or not, he recited the basic law, made underlying findings of fact and, applying the facts to the governing law, spelled out the existence of probable cause. The Appellate Division could not locate support in the record for two of the fact findings (that "the officers received information or complaint of gambling *at the premises in question*" and that the defendant "upon noting the officers * * * *apparently became excited.*"), which it deemed significant for the judge's conclusion. Saying that it had examined the uncontradicted proofs anew, it merely concluded that probable cause to arrest failed to exist, without indicating how or why it reached that result.

In approaching our review of the Appellate Division's conclusion, we agree that the trial judge was incorrect in stating that the police had information of gambling at Holly's restaurant and his finding that defendant "apparently

became excited" upon being observed, whether or not a legitimate inference, will be disregarded. What we have is undisputed testimony, without the involvement of any appreciable factor of credibility. The defendant does not suggest otherwise. The determination as to probable cause concerns only the application of law thereto. In view of this and particularly in the light of the error in the trial court's underlying findings and the absence of any analysis to support the Appellate Division's summary conclusion of reversal, it is especially incumbent upon us to make an independent appraisal of the record and reach our own determination of the question.[2]

The concept of probable cause requisite to establish the validity of an arrest and the consequent right to make an incidental warrantless search has a thoroughly established definition. It is, however, necessarily somewhat nebulous since concrete application involves the judicial creation of a hypothetical state of mind according to an objective standard from facts in the record and inferences legitimately drawn therefrom concerning the knowledge of a particular police officer at one moment of time in relation to a particular believed criminal episode and a particular proposed defendant. The latest expression of the United States Supreme Court in the instant connotation, following a long line of similar pronouncements, is found in *Beck v. State of Ohio*, 379 *U. S.* 89, 85 *S. Ct.* 223, 13 *L. Ed. 2d* 142 (1964):

---

[2] Whenever a constitutional issue is involved on the admissibility of evidence, it is obligatory upon a state appellate court to undertake a wide range of inquiry and careful review, even when conflicting proofs are involved, to determine the adequacy of the proof and the correctness of the determination in order to assure that the constitutional criteria have been respected. *State v. Smith*, 32 *N. J.* 501, 549 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961) ; *State v. Johnson*, 42 *N. J.* 146, 160, *n.* 2 (1964). *Cf. Ker v. State of California*, 374 *U. S.* 23, 34, 83 *S. Ct.* 1623, 10 *L. Ed. 2d* 726, 738 (1963). Of course, where the evidence is so conflicting that the finding has to turn on credibility, "* * * the conclusion of the one who saw and heard the witnesses should be given controlling regard unless very clearly erroneous." *State v. Smith, supra*, 32 *N. J.*, at *p.* 550; *State v. King*, 44 *N. J.* 346 (1965).

"The constitutional validity of the search in this case, then, must depend upon the constitutional validity of the petitioner's arrest. Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—*whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.* Brinegar v. United States, 338 U. S. 160, 175–176, 69 S. Ct. 1302, 1310–1311, 93 L. Ed. 1879, 1890; Henry v. United States, 361 U. S. 98, 102, 80 S. Ct. 168, 171, 4 L. Ed. 2d 134[138]. *'The rule of probable cause is a practical, non-technical conception* affording the best compromise that has been found for accommodating \* \* \* often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.' Brinegar v. United States, supra, 338 U. S., at 176, 69 S. Ct. [1302], at 1311 [93 L. Ed., at 1891]." (85 *S. Ct.*, at *p.* 225, 13 *L. Ed. 2d*, at *p.* 145; emphasis supplied)

The previously announced views of this court are in accord. *State v. Smith*, 37 *N. J.* 481 (1962), *cert.* denied 374 *U. S.* 835, 83 *S. Ct.* 1879, 10 *L. Ed. 2d* 1055 (1963); *State v. Burnett*, 42 *N. J.* 377 (1964). The more detailed exposition of "ground rules" by Chief Justice Weintraub in a related context in the latter opinion is worthy of repetition:

"\* \* \* Probable cause is said to be a reasonable basis for the 'belief' that a crime has been or is being committed. The quality of that belief is not precisely defined in our cases. We know it is something more than a raw suspicion but something less than a finding of guilt. Discussions usually turn to the opinion of Mr. Justice Rutledge in *Brinegar v. United States*, 338 *U. S.* 160, 173, 69 *S. Ct.* 1302, 1309, 93 *L. Ed.* 1879, 1889 (1949), where in contrasting probable cause with guilt he said:
'\* \* \* There is a large difference between the two things to be proved, as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them.'
The opinion continues (338 *U. S.*, at *p.* 175, 69 *S. Ct.*, at *p.* 1310, 93 *L. Ed.*, at *p.* 1890):
'In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

"The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." *McCarthy v. DeArmit*, 99 *Pa.* 63, 69, quoted with approval in the *Carroll* opinion. 267 *U. S.*, at 161, 45 *S. Ct.* 280, 69 *L. Ed.* 554, 39 *A. L. R.* 790. And this "means less than evidence which would justify condemnation" or conviction, as Marshall, Ch. J., said for the Court more than a century ago in *Locke v. United States*, 7 *Cranch* (*U. S.*) 339, 348, 3 *L. Ed.* 364, 367. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States*, 267 *U. S.* 132, 162, 45 *S. Ct.* 280, 288, 69 *L. Ed.* 543, 555, 39 *A. L. R.* 790.'

In footnote 14 the opinion elaborates upon the reference to Chief Justice Marshall:

'Marshall's full statement in *Locke v. United States* was: "It may be added, that the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation; and, in all cases of seizure, has a fixed and well known meaning. It imports a seizure made under circumstances which warrant suspicion." 7 *Cranch* (*U. S.*) 339, 348, 3 *L. Ed.* 364, 367.'

Probable cause then is something sufficient to engender a belief somewhere between a bare suspicion and a conviction of guilt. We take it that Chief Justice Marshall's word 'suspicion' would be acceptable if qualified by 'well grounded.' Further, the issue is not whether the information which reached the officer was true or false but only whether the officer was reasonable in accepting the information as true. And in reaching his 'belief' the officer is not limited to evidence admissible in the courtroom. For example, hearsay will do if coupled with something to give it credit, and evidence deemed too dangerous at trial, *i. e.*, prior arrests and convictions, may be accorded probative effect. See *State v. Burrachio*, 39 *N. J.* 272, 275 (1963). * * *" 42 *N. J.*, at *pp.* 386–387

██ Beyond these fundamental generalities, the determination of whether or not there was probable cause to arrest has to depend on the particular situation as disclosed by and deducible from the record. It will be rare indeed if two cases are factually identical. The situation in a case to be decided must be judged by the factual complex in interrelated entirety. As Mr. Justice Frankfurter put it in his concurring opinion in *Chapman v. United States*, 365 *U. S.* 610, 618, 81 *S. Ct.* 776, 5 *L. Ed.* 2d 828, 834–835 (1961): "* * * whether or not a search is 'unreasonable' turns on the circum-

stances presented by a particular situation, as a matter of substantive determination." Few cases have simply a single element determinative of the prudence of the action taken. Consideration of the various factors separately, which is defendant's thesis here, may show no one in itself sufficient, but in combination the test may be met. Nor can the proofs be accurately appraised without regard to the nature of the believed crime involved and the recognized methods or devices of its commission. In all aspects, the common and specialized experience and work-a-day knowledge of policemen must be taken into account. *Cf. State v. Tanzola,* 83 *N. J. Super.* 40 (*App. Div.* 1964), certif. denied 42 *N. J.* 419 (1964). Courts should always remember that arresting officers have to act on the spur of the moment and that they are not constitutional lawyers. *State v. Romeo, supra,* 43 *N. J.,* at *p.* 206. Judicial review must be "in a commonsense and realistic fashion." *United States v. Ventresca,* 85 *S. Ct.* 741, 746, 13 *L. Ed. 2d* 684, 689 (1965).

In this framework the total circumstances here are to be assessed. The criminal activity involved was gambling, more specifically, bookmaking. "* * * [T]he business is carried on cautiously and furtively and in as many different ways and by as many conceivable methods as human ingenuity can devise in order to escape detection and criminal consequences * * *." *State v. Romeo, supra,* 43 *N. J.,* at *p.* 207. See also *State v. Fiorello, supra,* 36 *N. J.,* at *p.* 92. As Mr. Justice Brennan said while a member of this court:

"The betting transaction between bettor and bookmaker may occur in a personal interview or over the telephone or by means of other communication media, and at any place—the bookmaking gentry requires no fixed place of business. Practitioners may carry the necessary tools about their persons and ply their trade on the street, in a shop or factory, or from the nearest telephone. The criminality of the pursuit makes the bookmaker cautious and furtive; certainly he has no desire to call attention to what he is doing." *State v. O'Shea, supra,* 16 *N. J.,* at *p.* 6.

Law enforcement officers have an even higher and more detailed degree of knowledge than judges of the devious ways

432

of the bookmaker. This forms an essential factor in their resolution of probable cause which courts should take into account. *United States v. Schwartz,* 234 *F. Supp.* 804, 807 (*D. W. D. Penna.* 1964).

 Lieutenant Manghisi was in charge of a plain-clothes squad one of whose duties was to suppress gambling. He had information that it was being carried on in the general area in question. Restaurants, luncheonettes, taverns and public telephones are likely places to keep under surveillance for concrete manifestations. The defendant was known to him by sight as a gambler. It would not be unreasonable for him to think of a dice game participant as also a possible street level bookmaker, and he had some information—not sufficiently substantiated to stand alone as far as this record is concerned—that he might well be engaged in making book. We should interject that if there were nothing beyond this but the sight of the defendant making a phone call from a pay booth in a restaurant, probable cause to arrest and make the incidental search would not exist. *Beck v. State of Ohio, supra,* 379 *U. S.* 89, 85 *S. Ct.* 223, 13 *L. Ed. 2d* 142; *State v. Scharfstein,* 42 *N. J.* 354 (1964), affirming 79 *N. J. Super.* 236 (*App. Div.* 1963). Compare *Draper v. United States,* 358 *U. S.* 307, 79 *S. Ct.* 329, 3 *L. Ed. 2d* 327 (1959); *State v. Burnett, supra,* 42 *N. J.* 377, affirming 79 *N. J. Super.* 242 (*App. Div.* 1963).

But defendant's conduct in the phone booth on being observed, coupled with everything else we have mentioned, was enough to make out adequate probable cause to arrest on appropriate application of the principles earlier discussed. The telephone conversation, with slips of paper in hand, the prompt hanging up of the receiver, the furtive attempt to conceal the paper by sliding it under his leg and then into his pants pocket and the effort to leave the booth apparently empty-handed were sufficient to ground a reasonable, well-founded belief, in the light of the lieutenant's background and other knowledge, that the defendant was taking bets over the phone from his customers or reporting previously received

wagers to his superiors in the criminal chain and so that bookmaking was then and there being committed or had been. *Cf. Davis v. People of State of California*, 341 *F.* 2d 982 (9 *Cir.* 1965). It may be added that while defendant's devious moves could hardly be considered those of a man innocent of any wrongdoing, arrest is not precluded simply because an innocent construction of a defendant's acts is possible. *United States v. Bianco*, 189 *F.* 2d 716 (3 *Cir.* 1951); *United States v. Hill*, 114 *F. Supp.* 441 (*D. D. C.* 1953).

The final query is whether there was an actual arrest of defendant at the time and by means of the order to empty his pockets. He contends that the arrest did not occur until after the search produced the incriminating evidence and he was charged with the offense at the police station and thus that the search was only exploratory and the arrest an incident of it rather than vice versa. A search to produce grounds for an arrest is, of course, invalid and, conversely, an arrest without at least contemporaneous probable cause does not become justified by what the subsequent search discloses. *State v. Hutchins*, 43 *N. J.* 85 (1964). We have held, however, that where an arrest is valid independently of, and is not made to depend on, the search or its result, evidence produced by the search will not be suppressed merely "because in precise point of time the arrest does not precede the search," *State v. Doyle*, 42 *N. J.* 334, 343 (1964). But without resort to that rule, we think here it is clear on the uncontradicted proofs that the arrest, in the connotation involved, legally took place by the command to disgorge the contents of the pockets and thus prior to the search, at which moment, as we have previously held, there was probable cause to arrest. It is true that the record does not show that any formal language of arrest was used, but that fact is not vital. The restraint of the person and restriction of liberty of movement was sufficient, in the circumstances (where the object was not merely to question), to constitute the arrest. *State v. Doyle, supra*, 42 *N. J.*, at *p.* 342; *Henry v. United States*, 361 *U. S.* 98, 80 *S. Ct.* 168, 4 *L. Ed.* 2d 134 (1959); *cf. Davis v.*

*People of State of California, supra,* 341 *F.* 2d 982 (9 *Cir.* 1965). In the *Henry* case the triggering act of the FBI agents was to stop a car in which the defendant was riding. Although probable cause to arrest was found not to exist then, Mr. Justice Douglas said: "When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete." 80 *S. Ct.,* at *p.* 171, 4 *L. Ed.* 2d, at *p.* 139.

The judgment of the Appellate Division is reversed and that of the trial court reinstated.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL and HANEMAN—5.

*For affirmance*—None.