706 A.2d 757

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. BYRON BROOKS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 22, 1998—Decided February 24, 1998.

Before Judges SHEBELL, D'ANNUNZIO and COBURN.

*Kevin G. Byrnes*, Designated Counsel, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Michael B. Jones*, Assistant Deputy Public Defender, of counsel and on the brief).

*Marcia H. Geraci*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Ms. Geraci*, of counsel and on the brief).

The opinion of the court was delivered by

COBURN, J.A.D.

Defendant, Byron Brooks, after a trial by jury, was convicted on count one of murder, *N.J.S.A.* 2C:11–3a(1) and –3a(2); on count four of third-degree possession of a weapon, a knife, for an unlawful purpose, *N.J.S.A.* 2C:39–4d; and on count five of third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a). He was acquitted on the remaining counts of the indictment, which charged felony murder and attempted aggravated sexual assault. The court merged count four into count one, and sentenced the defendant to prison terms of thirty years without parole on count one and five years, to be served consecutively, on count five.

The convictions were based on the June 6, 1993, murder of J.S. The murder occurred in the victim's Trenton apartment, where she lived with her four-month old child who was left to fend for himself after the killing. Almost two days passed before the victim and the child were discovered. The defendant confessed. Although at trial he claimed that another person committed the crimes, he does not contend the verdict was against the weight of the evidence. His appeal is limited to these five unpersuasive technical arguments:

### POINT I

THE JUDGE ERRED IN ADMITTING DEFENDANT'S STATEMENT WHICH WAS TAKEN IN VIOLATION OF THE BRIGHT–LINE RULE OF *STATE V. HARTLEY*.

### POINT II

THE JUDGE'S JURY CHARGE ON THE ISSUE OF DEFENDANT'S STATE-MENT TO THE POLICE FAILED TO PROPERLY GUIDE THE JURY'S EVALUATION OF THE CONFESSION AND DEFENDANT'S CONVICTIONS MUST BE REVERSED. (PARTIALLY RAISED BELOW).

A. The Judge's Failure to Specifically Instruct the Jury on the Issue of Corroboration Requires Reversal.

B. The Failure to Charge That the Jury Must Find the Statement Credible Beyond a Reasonable Doubt Requires Reversal.

## POINT III

THE JUDGE'S CURATIVE CHARGE REGARDING THE PROSECUTOR'S OPENING STATEMENT WAS CONFUSING AND INEFFECTIVE AND DEFENDANT'S CONVICTION MUST BE REVERSED.

## POINT IV

THE JUDGE'S LIMITING INSTRUCTION REGARDING DRUG USE WAS INADEQUATE, INEFFECTIVE AND PREJUDICIAL TO THE DEFENDANT AND DEFENDANT'S CONVICTIONS MUST BE REVERSED.

## POINT V

THE JUDGE'S CHARGE ON PASSION/PROVOCATION MANSLAUGHTER WAS CONFUSING AND DEFENDANT'S CONVICTION FOR MURDER MUST BE REVERSED. (PARTIALLY RAISED BELOW).

### I.

On the afternoon of Saturday June 5, 1993, the victim, four of her cousins, and the defendant gathered in the victim's apartment to watch television, talk, and use drugs. By 8:30 p.m., everyone left except the victim and her child. Later that night, the defendant returned and obtained the victim's promise to have sexual relations in return for crack cocaine. She was a cocaine addict. The defendant purchased the cocaine and again returned to the apartment. After he and the victim smoked the cocaine, they began to engage in sexual relations on the couch. However, before he was able to consummate the act, the victim demanded more drugs or money. When he declined, she told him to leave. They began to fight and she scratched him. He became upset and punched her in the face. She ran to the kitchen and grabbed a butcher knife with a wooden handle. He ran after her, and grabbed a steak knife with a black plastic handle. As they faced each other, he stabbed her in the chest. They fell on an unassembled baby crib that had been propped up against a wall between

the couch and the kitchen, landing on top of the crib mattress. The defendant "flipped" and continued stabbing her. He recalled stabbing her at least eight times. The medical examiner indicated that there were "innumerable" stab wounds of the neck and chest and "a throat slashing." After the murder, the defendant wiped blood from his face and neck with a wash cloth which he later threw away near his house. He dumped the contents of the victim's purse to create the illusion of a robbery, got dressed, and fled, leaving the child on the sofa. It would appear that the murder occurred about 2:45 a.m. since at that time a neighbor, who resided in the apartment below that of the victim, heard noises from above which sounded like furniture being pulled back and forth across the victim's apartment floor. The noise lasted about twenty minutes.

On the morning of Monday June 7, 1993, the building manager entered the victim's apartment with a pass key so that, as previously agreed, he could install a new toilet. He discovered the victim's body and immediately called the police. The paramedics arrived first and they found the child under the cushions of the couch. When the police arrived, they found that there were no signs of forced entry into the apartment.

After speaking with the building manager, the police went to the home of the victim's mother. Conversation with the mother led them to contact the victim's brother, F.S., who told them of the defendant's presence in his sister's apartment on Saturday afternoon and evening. The police located the defendant at his home. He agreed to come down to the police station, where, ultimately, he admitted his complicity and provided the police with detailed information entirely in accord with the circumstances revealed at the scene of the murder.

## II.

Defendant's first contention is that the trial court erred in admitting into evidence, after a pre-trial hearing, his oral and written confessions. He argues that his confessions were illegally

extracted by the police after he had asserted his right to remain silent under *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), because they did not readminister the *Miranda* warnings as required by *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986), and *State v. Harvey,* 121 *N.J.* 407, 581 *A.*2d 483 (1990), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991). In mounting his argument, the defendant ignores *State v. Martini,* 131 *N.J.* 176, 619 *A.*2d 1208 (1993), which clarified the holding in *Harvey* and dictates affirmance of the decision of the trial court on this point.

## A

The facts leading up to the confessions are undisputed. The police met the defendant at his home and brought him to the police station with his consent. During the ride, he seemed eager to speak and asked questions about the case. Although he was not yet a suspect, the police read him his *Miranda* rights and the defendant said he understood them. He made statements indicating his presence at the victim's home on June 5 and the sharing of drugs with the victim and the others. He said he left when the drugs ran out, went home, got $10 from his mother, bought some crack cocaine, smoked it, and went to sleep.

Upon arrival at the police station, at around 7:00 p.m., he was again administered his *Miranda* rights. He expanded somewhat on his story, but made no admissions of significance. He was calm, cooperative and responsive during the interview. When the police officer noticed fresh scratch marks on the defendant's face and neck, he asked the defendant to remove his sweat shirt. The defendant complied, and the officer noted more scratch marks on defendant's chest and shoulder. The defendant claimed he received the scratches during a ten-second fight with a drug dealer. The officer noted a red substance on the sweat shirt.

Around 8:45 p.m., the defendant permitted the police to photograph his scratch marks and consented to a search of his home. The search turned up nothing of evidential value. The defendant

gave the police his sweat shirt, and they returned to the police station. At about 11:30 p.m., the defendant said he was tired and wanted to go home, but that he would come back to speak further with the police the next morning at 11:00 a.m. One of the police officers drove the defendant home.

The next day, June 8, 1993, the police picked defendant up at his home and brought him to the police station. He was calm. At about 12:25 p.m., a detective readministered defendant's *Miranda* rights. Another detective advised defendant that he was a suspect in the case. The defendant assured that detective that he fully understood his rights and wished to continue speaking with the police. He was polite, cooperative, and responsive to questions, but he continued to claim that he did not kill the victim. During this interview the detective pressed the defendant about the blood on his sweat shirt. The defendant became nervous, his hands and leg began to shake, he began to sweat heavily, and he moved around quickly in his chair. Finally, he asked the detective why he did not just charge him with the murder and "get it over with." The detective responded that he wanted the defendant to tell him the truth. The defendant asked if he could "think about it for awhile." The detective agreed, offered to get the defendant something to eat or drink, which he declined, and they took a break.

Approximately twenty minutes later, at about 2:50 p.m., the detective resumed the questioning. The defendant again assured the detective that he was willing to waive his rights and continue talking to him. Since the interview made no progress, the police decided after a few minutes that another officer, Deputy Chief Joseph Constance, should conduct the questioning.

Constance showed defendant his executed *Miranda* rights form, and the defendant again said he understood his rights and was willing to waive them and speak with the police. Constance reminded the defendant that he was the last person to see the victim alive, that his previous stories contained discrepancies, and that there was probably a transfer of blood, hairs, and fibers at

the crime scene. Constance then asked the defendant where the baby was when he left the crime scene. The defendant replied that the baby was on the couch cushions. Constance asked if the defendant cared for the welfare of the baby since he had been left alone for about thirty hours. The defendant then gave the response upon which he relies for his claim that he asserted his right to remain silent. As related by Constance, the defendant "said if he could have a phone call to his mother, he would then tell me the truth, he would then tell me what occurred."

Constance advised the defendant that he "certainly would allow him to call his mother if we then can resolve this matter." Another detective took the defendant to a room where, in the presence of that detective, the defendant spoke briefly to his mother. He said that he had "fucked up again," that he was going away for a long time and did not want her or his brother visiting him while he was in prison. After a brief pause, he ended the conversation by saying, "I love you, too." The call was placed at 3:15 p.m.

The defendant was then brought back to Constance, and after a few minutes, the defendant gave a detailed oral confession and agreed to give a formal statement. At 3:45 p.m., Detective Sergeant Michael Salvatore began the formal interview by saying this to the defendant:

> You have been previously advised of your constitutional rights and stated that you understood your rights. You have also stated that you wish to speak with us at this time in regard to this investigation. We are now going to ask you a series of questions. Will you answer us truthfully and to the best of your knowledge?

The defendant responded that he would and provided a five page typewritten statement, which he signed after it was read to him.

### B.

In *State v. Hartley, supra*, the Court held that when the police initiate questioning in a custodial setting after having obtained a waiver of defendant's *Miranda* rights, and the defendant asserts his right to remain silent, a statement obtained thereafter by

further questioning initiated by the police is inadmissible, unless the police had first readministered the *Miranda* rights. 103 *N.J.* at 256, 511 *A.*2d 80; *State v. Fuller*, 118 *N.J.* 75, 83, 570 *A.*2d 429 (1990). In *Hartley*, the statement which the Court deemed to be an expression of a desire to end the interview was this: " 'I don't believe I want to make a statement at this time.' " *Id.* at 258, 511 *A.*2d 80.

In *State v. Harvey, supra,* the defendant, while in custody for several days, had repeatedly expressed his reluctance to speak to the police. After receiving a set of *Miranda* warnings, he informed the police that " 'he would tell [them] about the murder but he first wanted to speak to his father.' " 121 *N.J.* at 417, 581 *A.*2d 483. Questioning ceased. Approximately three-and-one-half hours later, and shortly after the defendant had been given an opportunity to meet in private with his father, the police resumed the interrogation. The Court said:

> But what makes the interruption significant is not its length so much as its nature. The request here was qualitatively different from the one in *State v. Bey*, 112 *N.J.* 123, 139, 548 *A.*2d 887 (1988) *(Bey II )*, in which the defendant "requested permission to lay down and to think about what happened." The Court likened that situation to one in which a defendant asks for "something to eat or drink, the use of toilet facilities, [or] the opportunity to stand and stretch * * *." *Ibid.* Defendant's request here was not for a brief respite to satisfy physical need. Instead he was asking, after three days in custody, for the chance to consult with a close family member.
>
> Defendant's request is similar to the one in *State v. Hartley, supra,* 103 *N.J.* at 258, 511 *A.*2d 80, in which the defendant told the police, "I don't believe I want to make a statement at this time." In both cases the defendant suggested that he would talk to the police later. "[A] request to terminate an interrogation must be honored 'however ambiguous.' " *State v. Bey,* 112 *N.J.* 45, 64, 548 *A.*2d 846 (1988) *(Bey I )* (quoting *State v. Kennedy,* 97 *N.J.* 278, 288, 478 *A.*2d 723 (1984)). Certainly the request here was no more equivocal than the one in *Bey I* in which, according to the police, the defendant had "indicated he did not want to talk * * * about it * * * ." *Ibid.* Defendant's conduct during three days of interrogation and his refusal to answer questions about the Schnaps murder likewise indicated that he did not want "to talk about it."
>
> This case also resembles *Law v. State,* 21 *Md.App.* 13, 318 *A.*2d 859 (1974), in which the police were questioning the wounded defendant as he lay handcuffed to his hospital bed. The defendant told the police that "he didn't want to talk any more until he was further treated." *Id.* at 36, 318 *A.*2d at 872 (emphasis deleted). Despite his request, the police continued to question him. The court held that the

defendant's ensuing statement was inadmissible. Although the obvious difference from this case is that here defendant was not wounded, the court's decision in *Law* rested on the defendant's words, not on the surrounding circumstances. In both this case and *Law*, the defendants indicated that they would talk, but only after a subsequent condition had been met. In *Law* the condition was further treatment. Here the condition was a meeting with defendant's father. The implied intent to talk later does not change the fact, as the court found in *Law* and as we find here, the defendant sought to terminate the interrogation.

[*Id.* at 419–20, 581 *A*.2d 483.]

The Court then went on to note the following:

The importance of the police's failure to reissue *Miranda* warnings after defendant had met his father is clearly shown by what happened when the police finally did give him the warnings. After defendant had confessed orally, the authorities gave him new *Miranda* warnings before seeking to take a formal statement. Defendant immediately demanded an attorney before any statement could be reduced to writing. It is no stretch to imagine that defendant would have requested an attorney had the police given him warnings when they first interrogated him after he had met with his father.

[*Id.* at 420, 581 *A*.2d 483.]

The defendant argues that we should focus only upon the words he spoke when he asked to telephone his mother, without regard to the surrounding circumstances, in deciding whether he had invoked his right to remain silent. He claims that like the defendant in *Harvey* he indicated that he would talk, "but only after a subsequent condition had been met." *Ibid.* In particular, he points to this statement in *Harvey*: "Although the obvious difference from this case is that here defendant was not wounded, the court's decision in *Law* rested on the defendant's words, not on the surrounding circumstances." *Id.* at 419, 581 *A*.2d 483. Had *Harvey* been the final judicial response to this issue, defendant's position might be viewed as meritorious. However, the discussion in *State v. Martini, supra*, provides adequate support for admission of the confessions in the context of this case.

In *Martini*, the defendant received formal *Miranda* warnings on five occasions and on each occasion he signed the waiver forms indicating that he was willing to make a statement. 131 *N.J.* at 229, 619 *A*.2d 1208. However, he had not yet made a statement when he told one of the officers that " 'once he was allowed to speak with Therese [Afdahl] * * * he would freely talk with us

about the entire matter.'" *Id.* at 230, 619 *A.*2d 1208. The officer further related, "that Martini had stated that he wanted to tell Afdahl 'that he was going to cooperate with us and that he was going to tell us what had happened and that he wanted her to be aware of that fact.'" *Ibid.* Martini also said that he was going to advise Afdahl to tell "'the whole truth' to the officers." *Ibid.* It would appear that Martini's statements about his desire to speak with Therese Afdahl were no different from that of the defendant in *Harvey* in the sense that both "indicated that they would talk, but only after a subsequent condition had been met." *State v. Harvey, supra,* 121 *N.J.* at 420, 581 *A.*2d 483. However, in *Martini* the Court clarified *Harvey* by indicating that not merely the words spoken, but the full context in which they were spoken had to be considered in determining whether there had been an invocation of the right to remain silent:

> We found that the defendant [in *Harvey* ] had invoked his right to remain silent by asking to speak to his father. We began our analysis by noting that the defendant's request precipitated "a significant break in the interrogation," amounting to approximately three-and-one-half hours. *Id.* at 418–19, 581 *A.*2d 483. However, we also declared that "what makes the interruption significant is not its length so much as its nature" because the defendant, "after three days in custody, [asked] for the chance to consult with a close family member." *Id.* at 419, 581 *A.*2d 483. In addition, we noted that "[d]efendant's conduct during three days of interrogation and his refusal to answer questions" were expressions of his unwillingness to talk with police. Finally, we found important "what happened when police finally did give" Harvey a new set of *Miranda* warnings after his oral confession. "Defendant immediately demanded an attorney before any statement could be reduced to writing. It is no stretch to imagine that defendant would have requested an attorney had the police given him warnings when they first interrogated him after he had met with his father." *Id.* at 420, 581 *A.*2d 483.
>
> [131 *N.J.* at 231–32, 619 *A.*2d 1208.]

The *Martini* Court then distinguished *Harvey* in the following manner:

> Defendant's request to speak to Afdahl prior to talking to officers is materially different from the request made in *Harvey* in several respects. Prior to his request, defendant did not show a continued reluctance to talk to police. To the contrary, Martini signed forms indicating that he waived his right to remain silent. Defendant did not state, "'I don't believe I want to make a statement at this time[,]'" *Hartley supra,* 103 *N.J.* at 258, 511 *A.*2d 80, nor did he "'indicate [that] he did not want to talk about it * * * .'" *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey I* ). Instead, he voluntarily told Trahey and Petersen that if he could

speak to Afdahl, he would tell them about his "complete involvement" in the kidnapping and murder of Flax.

[131 *N.J.* at 232, 619 *A.*2d 1208.]

The circumstances in *Martini* parallel those involving the defendant in this case. There was no significant break in the interrogation, he had never expressed an unwillingness to talk with the police, he had signed the waiver form, and he voluntarily told the officer that if he could speak with his mother he would tell them the whole story. He did not indicate he wanted his mother's advice, and indeed, during his short telephone conversation with her he merely advised her that he was in trouble and that he loved her.

We recognize that *Martini* also took into account the nature of the defendant's relationship to the person with whom he wished to speak. The Court said:

Moreover, although defendant argues that his relationship with Afdahl was that of two close family members, we find her status as a participant in the then-alleged crimes to be more significant. This is not a situation in which a defendant created a lengthy gap in an interrogation to seek advice from someone outside of the relevant criminal activity. Afdahl was a major participant in the kidnapping and murder about which defendant was to be questioned. She was not an outside advisor but a likely co-defendant, potential informant, and possible alibi witness. In their two-to-three-minute conversation overheard by Officer Trahey, Afdahl did not consult with defendant. Indeed, defendant argues that he met with Afdahl not to seek advice but to inform her of his impending confession.

[*Id.* at 232–33, 619 *A.*2d 1208.]

The Court concluded by saying:

Defendant's request to speak with Afdahl did not amount to an invocation of his right to remain silent. The record does not indicate that defendant, as the defendants in *Hartley* or *Harvey*, was unwilling to make a statement before talking with Afdahl, and wished her advice. Rather, he merely wished to inform Afdahl of the decision he had already made to give a statement to law-enforcement officers. Nor is there anything in the records, such as a demand for an attorney by defendant before his statement was transcribed, to suggest that "defendant would have requested an attorney had the police given him warnings when they first interrogated him after he had met with" Afdahl. *Harvey, supra,* 121 *N.J.* at 420, 581 *A.*2d 483. We conclude, therefore, that defendant's statements and the fruits thereof, including his consents to the searches conducted by police, were properly obtained and admitted into evidence.

[*Id.* at 233, 619 *A.*2d 1208.]

The defendant contends that since he asked to speak to his mother, rather than a possible co-defendant, *Martini* requires that we find he invoked his right to remain silent. We conclude, however, that the nature of the relationship is only one factor to be considered in deciding whether there was an invocation of rights. In this case, every indicia points to a continued willingness on the part of the defendant to cooperate with the police investigation. He never deviated from that course. He did not indicate that he wanted to consult with his mother, or get her advice in any respect. During the brief telephone conversation, he asked her no questions. He merely reported his situation, explained that he was going to jail for a long time, and that he loved her. Therefore, we are satisfied, based upon our independent review of the record, *see State v. Contursi*, 44 *N.J.* 422, 428 n. 2, 209 *A.2d* 829 (1965), that the defendant's oral and written confessions were properly admitted into evidence.

### III.

Defendant's next point concerns the trial court's charge to the jury on the principles governing its consideration of the defendant's confessions. He argues that there were two errors: (1) failure to instruct that the jury should consider the presence or absence of corroboration; and (2) failure to instruct that the confessions should not be considered unless proven to be credible beyond a reasonable doubt. Neither contention was advanced during the trial. Consequently, the plain error rule applies. *R.* 2:10–2.

In *State v. Lucas*, 30 *N.J.* 37, 152 *A.2d* 50 (1959), the Court held that a defendant's request for a corroboration charge should be honored, but it also held that the failure to include the charge was not plain error. *Id.* at 62–63, 152 *A.2d* 50. In making that point, the Court emphasized the "entire thrust of the defense, aside from insanity, was to establish that the facts recited in the confession were untrue." *Id.* at 63, 152 *A.2d* 50. It then noted that in such a context, the charge was adequate because it advised

the jury to decide whether the confession was made by the defendant and whether it was credible in light of all the evidence. The Court said, "The jury, in weighing the confession, and assaying its truth, must have considered the state of the independent corroborative proofs." *Id.* at 63, 152 *A.2d* 50. In the almost identical circumstances presented by this case, we reach the same conclusion as did the *Lucas* court. In *State v. Ordog*, 45 *N.J.* 347, 364, 212 *A.*2d 370 (1965), *cert. denied*, 384 *U.S.* 1022, 86 *S.Ct.* 1942, 16 *L.Ed.*2d 1025 (1966), the Court followed *Lucas* on this point of law, and it did so again in *State v. Di Frisco*, 118 *N.J.* 253, 274, 571 *A.*2d 914 (1990), and in *State v. Roach*, 146 *N.J.* 208, 229, 680 *A.*2d 634, *cert. denied*, —— *U.S.* ——, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996).

 The second contention, that a jury must be told not to consider a confession unless proven beyond a reasonable doubt, is without legal support. Although *State v. Bowman*, 165 *N.J.Super.* 531, 398 *A.*2d 908 (App.Div.1979), contains a *dictum* which might be read as suggesting support for defendant's position, *id.* at 537, 398 *A.*2d 908, the case clearly holds that once the judge admits the confession, the jury's duty is limited to deciding whether it is credible. Under our law, it is only the elements of an offense which must be established beyond a reasonable doubt. *State v. Brown*, 80 *N.J.* 587, 592, 404 *A.*2d 1111 (1979).

## IV.

The defendant contends that a curative jury instruction regarding a remark made by the prosecutor in his opening statement was confusing, ineffective, and prejudiced defendant's right to a fair trial. The prosecutor said:

> You will, also, find during this case that evidence from the scene, evidence from the autopsy of [J.S.], Mr. Brooks' clothes, were all examined for hair and fiber matches. As far as hairs were concerned, you will find out during this case that there are no matches to Mr. Brooks. *As far as fibers are concerned, you will find that there are no matches to Mr. Brooks, except for one small cotton fiber found on the victim, which is consistent with the black—excuse me with the black shirt that Mr. Brooks turned over to the police from 14 Jarvis Place.*
>
> [ (Emphasis added).]

This remark was made despite the prosecutor's previous representation that the forensic scientist's testimony was being offered not to prove anything with respect to the cotton fiber but, rather, to merely show that the State had been diligent in its investigation. The defendant objected to the statement and a hearing ensued pursuant to *N.J.R.E.* 104. The trial court decided that the evidence would not come before a jury. Defendant's motion for a mistrial was denied and there is no complaint respecting that decision. During the charge at the conclusion of the case, the trial court addressed the jury on the subject of the fiber evidence in the following manner:

> With regard to this particular issue, one matter comes to mind that I will touch upon right now. During the course of the state's opening, there was a comment by the prosecutor ... with regard to fibers, and he indicated that there were no matches to Mr. Brooks *except for one small cotton fiber found on the victim which was consistent with a black shirt that Mr. Brooks turned over to the police* as a result of a consent search of his home at 14 Jarvis Place. And then there was *testimony during the trial itself, particularly from someone who is qualified as an expert, Mr. Low–Beir, [sic] and the essence of his testimony was that the fiber, the cotton fiber found on the victim was not inconsistent with the cotton black tee shirt found at 14 Jarvis Place.*
>
> Now, with regard to that, I will instruct you that you should draw no conclusions from that. That testimony did not support a proposition from which you can draw any conclusions. In this case, there is no probative value with regard to that. And I bring up this point only because it relates to a comment made to you during opening, something counsel believed would occur in some way during the course of the trial, and I focus on that for purposes of highlighting the instruction I have just given you, and also to tell you to disregard any comments of this nature with regard to a fiber, in regard to that shirt. It simply has no probative value in this particular case.
>
> [ (Emphasis added).]

There was no objection to the trial court's erroneous statement indicating the forensic expert had testified that the fiber found on the body of the victim was not inconsistent with the defendant's shirt. That testimony had only come out in the Rule 104 hearing, to which the jury was not privy. The defendant mentions this error in his brief. However, as the State points out, the forensic expert did testify before the jury, and in his testimony he said that testing failed to reveal the presence at the scene of any fibers which come from defendant's clothing. Furthermore,

the trial court charged that its recollection of the evidence was not "binding" on the jury, that it was the jury's recollection of the evidence which "count[ed]," and that the jury was the "sole judge[ ] of the facts." In this context, we are satisfied that the trial court did not commit plain error by its inadvertently erroneous remark. *R.* 2:10–2.

The trial court's charge, considered as a whole, clearly and firmly directed the jury to disregard any comments respecting the fiber. Thus, any prejudice created by the prosecutor's comment was effectively cured. *See State v. Winter,* 96 *N.J.* 640, 647, 477 *A.*2d 323 (1984); *State v. Zapata,* 297 *N.J.Super.* 160, 176, 687 *A.*2d 1025 (App.Div.1997).

## V.

As a matter of plain error, defendant contends the trial court erred in its limiting charge on the defendant's drug use. At the conclusion of the case, the trial court instructed the jury in these words:

> I mentioned in the preliminaries of this case that there would be some evidence coming before you with regard to drug purchases or drug use, and I gave you an instruction at that time. I would like to revisit that area for a moment. With regard to that evidence, should you accept it, in your deliberations, you must not infer that the defendant was in any way under the influence of drugs at any time relevant to the facts and circumstances involved in this case. You must not draw the conclusion or infer or find that the defendants [sic] was under the influence of drugs at any time relevant to the facts and circumstances of this case. Also, with regard to the use of drugs, I would again remind you that this evidence was allowed to come before you by the Court for certain purposes, and certain purposes only. If believed and accepted by you, this evidence may be considered by you for the limited purpose of allowing you to better understand the surrounding facts and circumstances of this case including such things as motive, opportunity, intent as they may enter into your thinking and analysis, but for no other purpose. And I specifically pointed out to you that you should not conclude in any way from this evidence, if you accept it, that the defendant is a bad character, for instance, and therefore, one who is likely to commit an offense. It has limited applicability to this case, as I have indicated to you, and I so charge you once again with regard to that evidence, provided, of course, that you accept that evidence.

■ The evidence of drug use came from the defendant's own statements and the entire story was permeated with the role

played by drugs throughout the evening, including the fact that the murder began as a drugs-for-sex deal. Thus, the defendant's drug use was part of the *res gestae* of the crime, and, consequently, a limiting instruction was unnecessary. *State v. Martini, supra,* 131 *N.J.* at 242, 619 *A.*2d 1208.

■ Assuming an instruction was required on this point, it might be argued that the charge was erroneous to the extent that it failed to indicate "the specific purposes for which the other-crime evidence could be considered." *State v. G.S.,* 145 *N.J.* 460, 472, 678 *A.*2d 1092 (1996). Generally, more is required than the " 'incantation of the illustrative exceptions contained in the Rule.' " *Ibid.* (citation omitted).

■ Since defendant did not object below, we must consider whether plain error occurred. Plain error is reversible if it is "clearly capable of producing an unjust result." *R.* 2:10–2. The question is whether the possibility of injustice is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971).

■ *State v. G.S., supra,* holds that the facts must be carefully considered in deciding whether "prejudice has resulted from the failure to give a sufficiently limiting instruction governing the use of other-crime evidence." 145 *N.J.* at 473, 678 *A.*2d 1092. Where the evidence of guilt is strong and there have been "strong, repeated admonitions not to use the other-crime evidence to establish a criminal predisposition," *id.* at 476, 678 *A.*2d 1092, it is appropriate to disregard the error. *Ibid.* Here, the trial court did strongly admonish the jury not to infer from defendant's drug use that defendant had a "bad character" or was more "likely to commit an offense." The court also instructed that apart from understanding such matters as motive, opportunity, intent, and the circumstances of the case, the jury was to consider the evidence for "no other purpose."

The defendant's reliance on *State v. Bragg,* 295 *N.J.Super.* 459, 685 *A.*2d 488 (App.Div.1996), in which we recognized an inadequate other-crime charge to be plain error, is misplaced. The case involved charges of kidnapping and aggravated assault. The case is clearly distinguishable. First, that case dealt with other-crime evidence which substantially preceded the crimes for which defendant was being tried; and the evidence was not in any sense part of the *res gestae.* Second, the evidence of guilt was minimal. Third, the trial court had failed to charge the jury not to use the other-crime evidence for improper purposes. Fourth, the "other-crime evidence of prior assaults posed a substantial risk that the jury would find defendant was criminally disposed, particularly since it learned of the defendant's assault upon the victim's mother and was never told that evidence was irrelevant." *Id.* at 469, 685 *A.*2d 488.

None of the circumstances of *Bragg* are present in the instant case. The defendant here fully confessed to his guilt, and the evidence at the scene of the crime corroborated his admissions, as did the fresh scratches on his body, and the blood on his sweat shirt. We are entirely satisfied that the charge did not prejudice the defendant in any respect.

## VI.

Defendant's last point relates to the trial court's charge on passion/provocation manslaughter, *N.J.S.A.* 2C:11–4b(2), in relation to murder, and to the related portion of the verdict form provided to the jury.

In the context of a murder case involving the possibility of passion/provocation manslaughter, murder has three elements: that defendant acted purposely or knowingly, that he caused death, and that he did not act in the heat of passion upon a reasonable provocation. The State has the burden of proving each element beyond a reasonable doubt.

The defendant contends that the charge in this case created confusion on the third element. He does not deny that the charge

expressly stated that the State had the burden of proving the absence of passion/provocation beyond a reasonable doubt; however, he points to the following language, which also appears in the current model jury charge, *Murder, Passion/Provocation and Aggravated/Reckless Manslaughter*, Revised 11/6/95, as being inconsistent with that proposition, and argues that it shifts the burden to defendant:

*First, you must determine whether the provocation was adequate.* Whether the provocation is adequate essentially amounts to whether loss of self control is a reasonable reaction to the circumstances. The provocation must be sufficient to arouse the passion of an ordinary person beyond the power of his control. For example, words alone do not constitute adequate provocation. On the other hand, a threat with a gun or a knife or a significant physical confrontation might be considered adequate provocation. *Second, you must determine whether the defendant actually was impassioned,* that is, whether he actually lost his self control. *Third, you must determine whether the defendant had a reasonable time to cool off;* in other words, you must determine whether the time between the provoking event or events, or the acts which caused death, was inadequate for the return of a reasonable person's self control. *Fourth, you must determine whether the defendant actually did not cool off* before committing the acts which caused death, that is, whether he was still impassioned at the time.

[ (Emphasis added).]

We are inclined to agree with the contention that the phrase "you must determine" in this charge, and in the model jury charge, is unfortunate. The defendant correctly points out that although the jury must understand the elements of passion/provocation manslaughter, it does not have to determine if they were present. Quite the contrary, the jury must only determine whether the State has proved beyond a reasonable doubt the absence of one or more elements of that crime. *State v. Grunow,* 102 *N.J.* 133, 145, 506 *A.*2d 708 (1986); *State v. Heslop,* 135 *N.J.* 318, 322, 639 *A.*2d 1100 (1994). However, jury instructions must not be viewed in isolation, but must be read as a whole. *State v. Heslop, supra,* 135 *N.J.* at 324, 639 *A.*2d 1100; *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). And in this case the trial court repeatedly stressed that the State had the burden of proving beyond a reasonable doubt the absence of the elements of passion/provocation manslaughter. There was no objection to this aspect of the charge, and we are satisfied that the jury fully

understood the obligation placed on the State by the law. Thus, even assuming this was error, it clearly was not plain error. *R.* 2:10–2.

The verdict form, in pertinent part, reads this way:

1. How do you find as to Count 1 of the Indictment charging that the defendant, Byron Brooks, did purposely or knowingly cause the death or serious bodily injury resulting in the death, of [J.S.], between June 5, 1993 and June 7, 1993?

 _____ _____
 NOT GUILTY GUILTY
 a) If not guilty go to question number 3.
 b) If guilty go to question number 2.

2. Did the State prove, beyond a reasonable doubt, that the defendant, Byron Brooks, did not act in the heat of passion resulting from reasonable provocation?

 (The State must disprove one of the following factors, beyond a reasonable doubt:

 1. There was adequate provocation;
 2. The provocation actually impassioned the defendant;
 3. The defendant did not have a reasonable time to cool off between the provocation and the act which caused death; and
 4. The defendant did not actually cool off before committing the act which caused death.)

 _____ _____
 The State didn't The State disproved
 disprove any of the one or more of the
 factors factors

■ The defendant contends the form has three errors: (1) it requires the jury to convict of murder before considering pas-

sion/provocation manslaughter; (2) the itemizing of the elements of passion/provocation manslaughter suggests a "heightened level of consideration should be given to the question of passion/provocation manslaughter"; and (3) "as to the latter two elements of passion/provocation manslaughter, the question is phrased as a double negative, that is that: 'the state need only disprove . . . the defendant did not have a reasonable time to cool off. . . .' " It is suggested that the "double negative construction is necessarily somewhat confusing and in this context . . . has the capacity to distort the verdict."

With respect to the first point, we note that the trial court repeatedly emphasized in its charge that in order to convict the defendant of murder the jury had to find the State had proven beyond a reasonable doubt the absence of at least one element of passion/provocation manslaughter. Thus, the court did not fall into the error of instructing the jury to first decide if the defendant was guilty of murder and to consider passion/provocation manslaughter only if it found the defendant not guilty of murder. *See State v. Coyle*, 119 *N.J.* 194, 222, 574 *A.*2d 951 (1990). Although we do not endorse the use of this particular verdict form, requiring, as it does, findings of fact rather than general verdicts of guilty or not guilty, *see State v. Diaz*, 144 *N.J.* 628, 643–45, 677 *A.*2d 1120 (1996); *State v. Simon*, 79 *N.J.* 191, 199–208, 398 *A.*2d 861 (1979); *State v. M.L.*, 253 *N.J.Super.* 13, 26–28, 600 *A.*2d 1211 (App.Div.1991), *certif. denied*, 127 *N.J.* 560, 606 *A.*2d 371 (1992); *State v. McAllister*, 211 *N.J.Super.* 355, 362–64, 511 *A.*2d 1216 (App.Div.1986), we do not perceive that the questions had the kind of coercive effect which concerned the courts in the above cited cases. All the trial court did here, in essence, was to break the charge of murder into its components parts. The charge clearly indicated that questions 1 and 2 had to be answered for there to be a verdict of guilty of murder and that the defendant would only be guilty of murder if the State disproved one of the elements of passion/provocation manslaughter.

■ As to the second point, we are unconvinced that placing a number before each element of passion/provocation manslaughter could have prejudiced the defendant simply because the first two elements of murder, as set forth in question 1, were not listed numerically.

The defendant does not explain why or how the use of the double negative could have confused the jury; nor is an alternative charge proposed. In the context of the entire charge, we believe the jury must have clearly understood the elements of passion/provocation manslaughter and the State's burden to prove beyond a reasonable doubt the absence of at least one or more of those elements.

Affirmed.