971 A.2d 418 (2009)
407 N.J. Super. 352
STATE of New Jersey, Plaintiff-Respondent,
v.
Gjelosh DOCAJ, a/k/a Jerry Docaj, a/k/a Jerry Docaj, Defendant-Appellant.
No. A-4592-06T4
Superior Court of New Jersey, Appellate Division.
Submitted March 31, 2009.
Decided May 27, 2009.
*419 Yvonne Smith Segars, Public Defender, attorney for appellant (Marcia Blum, Assistant Deputy Public Defender, of counsel and on the brief).
John L. Molinelli, Bergen County Prosecutor, attorney for respondent (Catherine A. Foddai, Senior Assistant Prosecutor, of counsel and on the briefs).
Appellant filed a pro se supplemental brief.
Before Judges SKILLMAN, GRAVES and ESPINOSA.
The opinion of the court was delivered by
ESPINOSA, J.S.C. (temporarily assigned).
Defendant Gjelosh Jerry Docaj was convicted of the purposeful or knowing murder of his wife, Kathy Docaj, in violation of N.J.S.A. 2C:11-3(a)(1) or (2); possession of a firearm for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a); and third degree unlawful possession of a handgun without a lawful permit, in violation of N.J.S.A. 2C:39-5(b). He was sentenced to life imprisonment on the murder conviction and concurrent terms for the other charges. The term of life imprisonment equates to seventy-five years in prison and, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, a parole-ineligibility period of sixty-three years and nine months.
Defendant appeals his convictions and his sentence. We affirm the convictions but remand for resentencing.
Defendant and Kathy Docaj, nee Visita Zadrima, were wed in Yugoslavia in 1983 in an arranged marriage. Kathy had lived in the United States since the age of nine and returned to America shortly after the wedding. Defendant, an Albanian national, followed soon thereafter. They had three children and eventually settled in Lodi, New Jersey. At the time of Kathy's death in February 2003, their son, Christopher, was eighteen years old, their daughter, Christina, was fifteen years old and their younger daughter was nine years old.
Kathy was employed as a concierge at a business in Manhattan near the Battery Park ferry terminus. Defendant worked in air conditioner and refrigeration *420 maintenance at a building in Manhattan. In the latter part of 2002, Kathy became acquainted with Robert Narciso, who also used the ferry to commute to Manhattan. Initially platonic, their relationship grew closer over several months. In mid-December 2002, Kathy told defendant that she no longer loved him. At Kathy's request, defendant moved out of the marital home to an apartment in Lodi in January 2003.
Approximately ten years earlier, defendant purchased a .38 caliber handgun, which he kept in a shoe box under his bed. At the time that he was moving out, he and Kathy discovered that Christopher had removed the gun some months earlier and kept it, unloaded, in his room since that time. Defendant took the handgun with him when he moved out.
Defendant began to suspect that Kathy was "cheating on him" and later told police that he saw her leaving her place of employment with "her boss." On February 7, 2003, Kathy telephoned defendant and told him that she was meeting a lawyer that day to prepare papers to file for divorce. Defendant's diary reflects that he begged her not to divorce him and that she replied, "[T]his thing has to be done." Kathy met with the lawyer and a complaint for divorce on the grounds of extreme cruelty was drafted.
Defendant and Kathy alternated weekends with the children. It was defendant's turn to spend the weekend of February 8 and 9 with the children. Narciso, a divorced father of two daughters, also alternated weekend child care with his wife. As a result, Kathy and Narciso were able to spend that weekend together. Kathy told defendant and her children that she was spending the weekend in Atlantic City with friends. Defendant wrote in his diary, "There's no way I understand how can a person who has been in love with her husband for 19 years can do something like this and go to Atlantic City to celebrate or for any other reason."
Defendant's diary also recorded his reaction to Kathy's failure to give him anything for his birthday on February 12: "My wife bought me nothing, I will remember this because one day by the power of God it will come that I will remember that day."
He bought a birthday cake, flowers and a card for Kathy for her birthday two days later. Around this time, Kathy told defendant that she had "another man lined up." Defendant also noticed her wearing jewelry that he had never seen before.
On February 17, 2003, Narciso received a telephone call from a man speaking English with a foreign accent who would not identify himself. In their brief conversation, Narciso commented that the caller knew more about him than he did about the caller. When Narciso asked for the caller's telephone number, the caller hung up.
It is reasonable to infer that defendant placed this call to Narciso. Christopher had noticed that Kathy was spending "too much" time on the telephone and used the "Star sixty-nine" feature to learn what number she was calling. He provided the number, which was Narciso's, to his father. A paper with Narciso's telephone number was found among the defendant's possessions by the police after his arrest.
Kathy and Narciso planned to spend the weekend of February 22 together. Their plans had to change when defendant told her that he had to work on Saturday and Kathy would have to care for the children. Defendant also told Kathy that he wanted to meet and talk to her. When she told him that she would not be coming home on Friday, he asked her why. She replied, "I'll come home when I want to."
*421 Kathy spent Friday, February 21, 2003, with Narciso at his apartment. He dropped her off one block from her home on Saturday in the early afternoon.
Defendant spent Friday night with his children. He awakened around 4:00 a.m. on Saturday and left for his apartment at approximately 6:00 a.m. After changing clothes, he took a book bag containing the.38 caliber handgun with him to work and stored the book bag in his locker.
While at work on Saturday, February 22, 2003, defendant called the marital home twice. Kathy was not home until his second call. Defendant asked her, "How was your night out at the club?" Kathy told him that she had been out until 3:00 or 4:00 a.m. When defendant said that he would see her later at the marital home, she replied, "Whatever." According to her daughter, Kathy was not looking forward to defendant's visit.
Defendant left work at approximately 6:00 p.m., carrying the book bag with the.38 caliber handgun with him to his apartment. He removed the handgun from the book bag, placed it in the waistband of his trousers underneath a vest, and proceeded to the marital home.
Defendant entered the home on the lower level. Kathy was present on that level with their three children and two friends of the children. Defendant and Kathy went upstairs to the kitchen, where they sat, drinking coffee and smoking. When Christopher came to the kitchen to use the telephone, defendant asked Kathy to go to the bedroom because "he wanted to talk to her about something." Defendant walked to the bedroom and Kathy followed him. The door closed and was locked.
Within a minute, Christopher heard his parents screaming and cursing, as well as noises of pushing and shoving. Then, he heard his mother scream and a single "boom." Christopher ran to the bedroom, trying unsuccessfully to open the door. He began screaming, "Open the door, open the door." Defendant opened the door and, white-faced, immediately said, "I'm sorry, I'm sorry." Defendant blocked Christopher from entering the room but Christopher was able to see his mother lying, bloody, on the floor. Drawn by the sounds, Christina came upstairs where she saw defendant and Christopher struggling and arguing. Defendant told Christina "she cheated on me for two years" and "she's gone." He continued to block Christina and Christopher from entering the bedroom.
Christina dialed "911" and asked for an ambulance, stating that she thought her mother was dead. Defendant can be heard on the tape recording of this conversation, yelling loudly, "She was cheating on me," "She was f__king cheating on me," "She was cheating on me for one year." A second call to "911" was made by Christopher, urgently requesting help.
Two policemen from the Lodi Police Department arrived to find Kathy lying in a pool of blood on the bedroom floor and a revolver resting on the lower end of the bed. Christopher was irate and about to walk out of the home. Defendant was in a daze, walking aimlessly in circles. Uncertain as to what had transpired, the police handcuffed both Christopher and defendant for "safety" reasons. Defendant was advised that he was not under arrest; he was not given Miranda[1] warnings and was not questioned by the police at this time.
Later investigation revealed that Kathy died from a single gunshot wound that entered the back of her head and exited from her forehead. The .38 caliber handgun found on the bed had been pressed *422 loosely against the back of her skull when it was fired. The medical examiner testified that she was not standing but was "positioned low" in relation to the shooter when she was shot.
Defendant gave a statement to the police and described what happened in the bedroom. He admitted that he had the gun with him when they went into the bedroom but denied that he had gone to the house with the intent to kill Kathy. He said that in the bedroom, he begged her to stay together for the children and that he would "forgive [her] to this point." He stated that Kathy was sitting on the bed and looked angry, "as if she really wasn't hearing it, that she didn't want to hear it." According to defendant, Kathy said, the "only thing you're getting are your walking papers." She struck him just once, "hit[ting] him on the left side of his face right by his mouth." He said, "Things went dark." He pushed Kathy downward with his left arm and tried to catch her with his right hand when it appeared that she might strike her face on the floor. He admitted that he had the handgun in his hand as he tried to grab her, but he did not remember withdrawing the handgun from his waistband, pulling the trigger, or what he did with the handgun after shooting Kathy.
Defendant raises the following points on appeal:
POINT I
THE INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER MISSTATED THE LAW. (Not Raised Below)
POINT II
IN HER OPENING STATEMENT, THE PROSECUTOR IMPROPERLY URGED THE JURY TO CONSIDER "THIS ... A TRIAL TO SEEK JUSTICE OF [SIC] HER DEATH."
POINT III
THE DETECTIVE WHO INTERROGATED DEFENDANT REPEATEDLY TESTIFIED THAT DEFENDANT "WAS NOT TELLING THE WHOLE TRUTH" AND "WAS TRYING TO HIDE SOME THINGS."
POINT IV
THE COURT TOLD THE JURY, WITH RESPECT TO THE ADMISSION OF DEFENDANT'S STATEMENT, THAT IT HAD ALREADY RULED ON "THE QUESTION OF MIRANDA RIGHTS." (Not Raised Below)
POINT V
THE EMERGENCY-MEDICAL TECHNICIAN REPEATEDLY CHARACTERIZED THE SHOOTING AS A "MURDER." (Not Raised Below)
POINT VI
THE POLICE DETECTIVE READ A PASSAGE FROM A BIBLE FOUND DURING THE SEARCH OF DEFENDANT'S HOME. (Not Raised Below)
POINT VII
DEFENSE COUNSEL'S FAILURE TO OBJECT AT TRIAL TO THE ERRORS RAISED IN POINTS I, IV, V, AND VI DEPRIVED DEFENDANT OF THE EFFECTIVE ASSISTANCE OF COUNSEL.
POINT VIII
THE TRIAL WAS SO RIDDLED WITH ERRORS THAT THEIR CUMULATIVE EFFECT RENDERED THE TRIAL UNFAIR.
POINT IX
A LIFE TERM, WHICH IS THE MAXIMUM SENTENCE AND WHICH CARRIES A MANDATORY PAROLE DISQUALIFIER OF MORE THAN 63 YEARS, IS GROSSLY EXCESSIVE.
*423 In a pro se supplemental brief, defendant argues that the passion/provocation manslaughter charge constituted reversible error because the trial court should have instructed the jury "that the State can only prove murder if it proves the absence of passion/provocation first" and because an instruction should have been given, pursuant to State v. Guido, 40 N.J. 191, 191 A.2d 45 (1963), that a "course of ill treatment" can provide the basis for adequate provocation. In addition, defendant contends that his Miranda rights were violated because the warnings were not given in a timely manner and interrogation continued when he was falling asleep.
[At the direction of the court the discussion of issues other than defendant's claim of error in the passion/provocation manslaughter charge has been omitted from the published version of the opinion]

I
We address first the passion/provocation manslaughter jury charge, an issue raised for the first time on appeal. State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990), identifies the four factors that must be present for a murder to be reduced to a passion/provocation manslaughter:
[T]he provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying.
The trial court provided the jury with the model jury charge on passion/provocation manslaughter current at the time the instruction was given. Defendant is correct in stating that the model jury charge contained an error. In one of four statements regarding the State's burden of proof as to the adequacy of the cooling-off period, the charge stated,
In other words, you must determine whether the State has proven that the time between the provoking event and the acts which caused death was inadequate for the return of a reasonable person's self-control.
[ (Emphasis added.) ]
As correctly noted elsewhere in the charge, the State's burden was to prove that the period of time was "adequate" for the return of a reasonable person's self-control. The question here is whether, within the context of the trial, that error had the clear capacity to lead the jury to convict the defendant of murder, "a result it otherwise might not have reached." State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997) (quoting State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971)). After reviewing the charge in its entirety, the evidence, the arguments of counsel and the questions asked by the jury, we conclude that the error was harmless.
Pursuant to Rule 1:7-2, defendant's failure to object constitutes a waiver of his right to challenge that instruction on appeal.[2] However, mindful of the principles that "appropriate and proper jury charges are essential to a fair trial," State v. Savage, 172 N.J. 374, 387, 799 A.2d 477 (2002), and are even more critical in criminal cases, Jordan, supra, 147 N.J. at 422, 688 A.2d 97, we review the charge to determine whether there was plain error clearly capable of producing an unjust result. R. 2:10-2; State v. Afanador, 151 N.J. 41, 54, 697 A.2d 529 (1997).
*424 Even in a criminal prosecution, the mere fact of error does not require reversal. To constitute plain error, the error must be: "[L]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970). The possibility of an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Taffaro, 195 N.J. 442, 454, 950 A.2d 860 (2008); Jordan, supra, 147 N.J. at 422, 688 A.2d 97; Macon, supra, 57 N.J. at 336, 273 A.2d 1. In short, the question here is whether the error made it easier for the State to get a conviction for murder as opposed to passion/provocation manslaughter. See State v. N.I., 349 N.J.Super. 299, 315-16, 793 A.2d 760 (App.Div.2002).
To make that evaluation, we review the error within the context of both the charge itself and the evidence and arguments presented at trial.

A. The charge.

When the error alleged concerns only a portion of a charge, the challenged portion is not to be "dealt with in isolation but the charge should be examined as a whole to determine its overall effect." State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973). See also State v. Delibero, 149 N.J. 90, 106, 692 A.2d 981 (1997).
The instruction on passion/provocation manslaughter was immediately preceded by the model jury charge for murder. In addition to the elements regarding causation and intent, the jury was told, "The third element that the State must prove beyond a reasonable doubt to find the defendant guilty of murder is that defendant did not act in the heat of passion resulting from a reasonable provocation." The passion/provocation manslaughter charge followed:
Passion/provocation manslaughter is a death caused purposely or knowingly that is committed in the heat of passion resulting from a reasonable provocation. Passion/provocation manslaughter has four factors which distinguish it from murder. In order for you to find the defendant guilty of murder, the State need only prove the absence of any one of them beyond a reasonable doubt.

The four factors are:
Number one, there was adequate provocation;
Number two, the provocation actually impassioned defendant;

Number three, the defendant did not have a reasonable time to cool off between the provocation and the act which caused death; and
Four, the defendant did not actually cool off before committing the act which caused death.
The first factor you must consider is whether the State has proven beyond a reasonable doubt that the provocation was not adequate. Whether the provocation is inadequate essentially amounts to whether loss of self-control is a reasonable reaction to the circumstance.
In order for the State to carry its burden, it must prove beyond a reasonable doubt that the provocation was not sufficient to arouse the passions of an ordinary person beyond the power of his control. For example, words alone do not constitute adequate provocation. On the other hand, a threat with a gun or knife or a significant physical confrontation might be considered adequate *425 provocation. Again, the State must prove that the provocation was not adequate.
The second factor you must consider is whether the State has proven beyond a reasonable doubt that the defendant was not actually impassioned; that is, he did not actually lose his self-control.
The third factor you must consider is whether the State has proven beyond a reasonable doubt that the defendant had a reasonable time to cool off. In other words, you must determine whether the State has proven that the time between the provoking event and the acts which caused death was inadequate for the return of a reasonable person's self-control.
The fourth factor you must consider is whether the State has proven beyond a reasonable doubt that the defendant actually did cool off before committing the acts which caused death; that is, that he was no longer actually impassioned.

If you determine that the State has proven beyond a reasonable doubt that there was not an adequate provocation or that the provocation did not actually impassion the defendant or that defendant had a reasonable time to cool off, or that defendant actually cooled off, and in addition to proving one of those factors you determine that the State has proven [the elements of murder] you must find the defendant guilty of murder.
On the other hand, [if] you determine that the State has not disproved at least one of the factors of passion/provocation manslaughter beyond a reasonable doubt, but that the State [has proven the elements of murder] then you must find him guilty of passion/provocation manslaughter.
[ (Emphasis added.) ]
A review of the charge therefore reveals that all four Mauricio factors were accurately introduced to the jury. See Mauricio, supra, 117 N.J. at 411-13, 568 A.2d 879. The third factor regarding the adequacy of the cooling-off period was stated correctly a second time. It was in recasting that factor "in other words" that the error was made. However, the court correctly summed up the State's burden as to murder and passion/provocation manslaughter thereafter:

If you determine that the State has proven beyond a reasonable doubt that there was not an adequate provocation or that the provocation did not actually impassion the defendant or that defendant had a reasonable time to cool off, or that defendant actually cooled off, and in addition to proving one of those factors you determine that the State has proven [the elements of murder] you must find the defendant guilty of murder.
[ (Emphasis added.) ]
Therefore, of the four references to the third factor and the State's burden, one was erroneous and three were correct. This was, then, an error that was isolated rather than pervasive in the charge. Compare State v. Martini, 187 N.J. 469, 478-80, 901 A.2d 941 (2006), cert. denied, 549 U.S. 1223, 127 S.Ct. 1285, 167 L.Ed.2d 104 (2007), with State v. Rodriguez, 195 N.J. 165, 171, 949 A.2d 197 (2008).
In Martini, the Court reviewed a similarly isolated error in the Judges Bench Manual for Capital Causes. Following the charge in the Manual, the trial court incorrectly instructed the jury that it had to find the mitigating factors unanimously. Martini, supra, 187 N.J. at 476, 901 A.2d 941. The Supreme Court viewed the instructions to the jury in their entirety, which included a curative instruction given after objection by counsel. Id. at 480, 901 A.2d 941. Satisfied that "the instruction *426 properly conveyed to the jury that each juror must individually determine whether a mitigating factor exists," the Court found no prejudicial error. Id. at 478-80, 901 A.2d 941. Quoting from its consideration of similar arguments in State v. Loftin, 146 N.J. 295, 375-76, 680 A.2d 677 (1996), the Court recognized that "`[v]iewed in isolation, the single remark ... might suggest that the preferred result is a unanimous conclusion concerning the existence or non-existence of a mitigating factor,'... but that `when the isolated remark is viewed in the context of the charge as a whole, it is clear that there was no error.'" State v. Martini, supra, 187 N.J. at 478-79, 901 A.2d 941.
Similarly, the error here was but one iteration imbedded in a charge that contained three entirely correct articulations of the State's burden regarding the third factor. In both describing the elements of murder and in summing up the State's burden as to the factors of passion/provocation manslaughter, the charge clearly conveyed the State's burden of proof. Specifically, the jury was instructed three times that, as to this factor, the State's burden was to prove beyond a reasonable doubt "that defendant had a reasonable time to cool off." The isolated error's capacity to dispel that overall effect was minimal, at best.

B. The evidence and arguments at trial.

Reviewing an error in jury instructions within the context of the trial, our courts have found the following factors significant: (1) the nature of the error and its materiality to the jury's deliberations, compare Jordan, supra, 147 N.J. at 422, 688 A.2d 97, with State v. Jackson, 289 N.J.Super. 43, 54, 672 A.2d 1254 (App.Div. 1996), certif. denied, 148 N.J. 462, 690 A.2d 609 (1997); (2) the strength of the evidence against the defendant, see Jordan, supra, 147 N.J. at 426, 688 A.2d 97; compare State v. Heslop, 135 N.J. 318, 639 A.2d 1100 (1994), with State v. Lawton, 298 N.J.Super. 27, 688 A.2d 1096 (App.Div.), certif. denied, 151 N.J. 72, 697 A.2d 545 (1997); (3) whether the potential for prejudice was exacerbated or diminished by the arguments of counsel, see Jordan, supra; Wilbely, supra, 63 N.J. at 422, 307 A.2d 608; (4) whether any questions from the jury revealed a need for clarification, see Savage, supra, 172 N.J. at 393-95, 799 A.2d 477; and (5) the significance to be given to the absence of an objection to the charge at trial, see Macon, supra, 57 N.J. at 341, 273 A.2d 1.
Errors in the jury instruction "on matters or issues that are material to the jury's deliberation are presumed to be reversible error." Jordan, supra, 147 N.J. at 422, 688 A.2d 97. A presumption of reversible error does not apply here because whether the defendant had "a reasonable time to cool off" was not "crucial to the jury's deliberations on the guilt of [the] defendant." Ibid. A review of the arguments made by the prosecutor and defense counsel clearly shows that the key Mauricio factor for both sides was whether there was adequate provocation to remove this case from murder.
The measure of adequate provocation is whether "loss of self-control is a reasonable reaction" to the provocation. Mauricio, supra, 117 N.J. at 412, 568 A.2d 879.
That test is purely objective, because the provocation must be `sufficient to arouse the passions of an ordinary [person] beyond the power of his ... control.' ... The provocation must be severe enough that the `intentional homicide may be as much attributable to the extraordinary nature of the situation *427 as to the moral depravity of the actor.'
[Ibid. (Citations omitted) (Emphasis added).]
Having no evidence of any physical provocation that could rise to such a level, the defense highlighted defendant's continuing and escalating emotional state throughout the month of February. Defense counsel's summation emphasized the defendant's enduring "emotional swirl" that allowed him to lose control:
Ladies and gentlemen of the jury, once again, please, I do not for one moment suggest that a slap of a person justifies the taking of a life. But after years of marriage, after week  months, weeks, days and hours of confusion, after being told you're out of here, you'll get your walking papers, that I have another man lined up, that that conversation there punctuated now by the first form of physical violence may, in fact, be the adequate provocation that churns this to the heat that  that this  that this killing was done in the heat of the passion, a loss of self-control, a passion/provocation manslaughter.
Since defense counsel conceded to the jury that a slap did not constitute adequate provocation, the question whether an adequate time to cool off passed between the slap and the gunshot was irrelevant to the jury's deliberations.
In her summation, the prosecutor declared that this was a deliberate murder. Stating that "there is no adequate provocation in this case," she plainly targeted that factor as the one the State had proven was absent:
If the State need only prove the absence of just one [factor], what that means is if you ... determine that there was no adequate provocation, defendant cannot be found guilty of passion/provocation manslaughter. He must be found guilty of murder.
Therefore, both the State and the defense clearly represented "adequate provocation" as the crucial issue for the jury's determination in considering passion/provocation manslaughter rather than whether defendant had a reasonable time to cool off.
The relative strength of the evidence of passion/provocation manslaughter weighs heavily in determining whether the error "led the jury to a result it otherwise might not have reached." See Macon, supra, 57 N.J. at 325, 273 A.2d 1. In Heslop, supra, 135 N.J. at 327, 639 A.2d 1100, the Supreme Court observed that it was "not faced with overwhelming evidence of passion/provocation as the singular and distinctive factor that led to the killing." The charge contained two significant errors: the "sequential error" condemned in State v. Coyle, 119 N.J. 194, 574 A.2d 951 (1990), and the failure to explicitly charge that the State bore the burden of proving the absence of passion/provocation beyond a reasonable doubt as required by State v. Erazo, 126 N.J. 112, 594 A.2d 232 (1991).[3] Despite the significance of these flaws, the Court found that the weakness of the case for passion/provocation manslaughter "militate[s] strongly against the actuality of prejudice that may have emanated from the somewhat maladroit instructions on that charge." Heslop, supra, 135 N.J. at 327, 639 A.2d 1100. The Court concluded that "a review of the factual record [did] not suggest the likelihood that the court's [charge] resulted in or contributed to an improper verdict." Id. at 328, 639 A.2d 1100. In contrast, in a "close" case, the presence of the same errors constituted *428 reversible error. Lawton, supra, 298 N.J.Super. at 39, 688 A.2d 1096.
The lack of proof of adequate provocation posed a critical weakness in the passion/provocation manslaughter evidence here. Adequate provocation is not satisfied by "words alone, no matter how offensive or insulting." State v. Crisantos, 102 N.J. 265, 274, 508 A.2d 167 (1986). A wife's repeated threats to kill her husband and burn the house down were deemed insufficient to warrant a passion/prejudice manslaughter instruction in State v. Rambo, 401 N.J.Super. 506, 951 A.2d 1075 (App.Div.), certif. denied, 197 N.J. 258, 962 A.2d 529 (2008). Similarly, Kathy's statements that she wanted a divorce and had "another man lined up" fail to meet the standard.
Defendant's claim that Kathy slapped him does not add substantial weight to a claim of passion/provocation. Although perhaps sufficient to warrant the instruction,[4] the evidence of an alleged slap was conceded to be insufficient to constitute adequate provocation. Even in instances of "mutual combat," the defendant's response must be proportionate to the provocation. State v. Oglesby, 122 N.J. 522, 536, 585 A.2d 916 (1991) (single blow by an unarmed woman was insufficient provocation to warrant an instruction on passion/provocation manslaughter); State v. Crisantos, supra, 102 N.J. at 280, n. 12, 508 A.2d 167; State v. Darrian, supra, 255 N.J.Super. at 449, 605 A.2d 716.
[T]he contest must have been waged on equal terms and no unfair advantage taken of the deceased.... The offense is not manslaughter but murder where the defendant alone was armed; and took an unfair advantage of the deceased.... [I]f a person, under color of fighting on equal terms, kills the other with a deadly weapon which he used from the beginning or concealed on his person from the beginning, the homicide constitutes murder.
[Crisantos, supra, 102 N.J. at 274-275, 508 A.2d 167 (citations omitted).]
Defendant brought a concealed and loaded handgun to the home that night. His response to his wife's refusal to abandon divorce proceedings, and even her slap, was wholly disproportionate to any provocation. As in Heslop, supra, 135 N.J. at 327, 639 A.2d 1100, the strength of the evidence supporting the State's theory that this was a deliberate murder "strongly militates against" a conclusion that the error in the charge contributed to a verdict that the jury might not otherwise have reached.
Turning to the prosecutor's summation, the prosecutor accurately identified all four Mauricio factors, including the third factor, and the fact that the State had to prove the absence of one beyond a reasonable doubt to sustain a murder conviction. Therefore, the summation did not exacerbate the error in the charge, but rather, added further to the "overall effect" of a charge that properly conveyed the State's burden of proof.
Our review of the jury's questions reveals no indication that the jury was misled *429 by the error. Unlike Savage, supra, 172 N.J. at 393-95, 799 A.2d 477, none of the jury's questions or requests suggested any confusion as to what the State had to prove beyond a reasonable doubt regarding passion/provocation manslaughter in order to secure a conviction for murder.
The lack of prejudicial impact is further evinced by the absence of an objection. See Macon, supra, 57 N.J. at 341, 273 A.2d 1 ("failure to object may suggest the error was of no moment in the actual setting of the trial"). The one-word error was imbedded in the model jury charge that trial courts are required to read to juries:
[M]odel jury charges should be followed and read in their entirety to the jury. The process by which model jury charges are adopted in this State is comprehensive and thorough; our model jury charges are reviewed and refined by experienced jurists and lawyers.
[State v. R.B., 183 N.J. 308, 325, 873 A.2d 511 (2005).]
Certainly, trial courts and counsel must review charges for potential error, even in model jury charges. However, this error was one word that was literally buried in a charge that was otherwise correct. The error went unnoticed by the "experienced jurists and lawyers" who "reviewed and refined" the charge, ibid., as well as the trial court and counsel here.[5] We conclude that the failure to object here reflected the obscure nature of the error and that it is more likely that the jury also depended upon the overall, correct expressions of the controlling legal principles rather than the one erroneous statement here.
In summary, we find that the error here was an isolated occurrence in a charge that repeatedly stressed the State's burden to prove the absence of one of the factors of passion/provocation manslaughter beyond a reasonable doubt. The prosecutor specifically targeted "adequate provocation" as the factor the State had proven was not present. The evidence and arguments of counsel clearly show that the adequacy of any cooling-off period was not a crucial issue regarding passion/provocation manslaughter. Moreover, the evidence regarding passion/provocation manslaughter was relatively weak. Finally, the prosecutor's summation did not exacerbate the error but, rather, diminished it. Accordingly, we conclude that the error in the charge did not lead the jury to a verdict that it otherwise might not have reached.
[At the direction of the court, the discussion of the other issues in the appeal has been omitted from the published version of the opinion.]
Defendant's conviction is affirmed. Defendant's sentence is vacated and the case is remanded for resentencing.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] If there had been an objection, the error could have been readily corrected by the substitution of a single word, "adequate," for "inadequate," as was done in a subsequent revision of the model jury charge.
[3] The instruction here did not include either of these errors.
[4] The threshold for a jury instruction for passion-provocation manslaughter is relatively low. Erazo, supra, 126 N.J. at 123, 594 A.2d 232; Coyle, supra, 119 N.J. at 224, 574 A.2d 951; Crisantos, supra, 102 N.J. at 278, 508 A.2d 167; Rambo, supra, 401 N.J.Super. at 515, 951 A.2d 1075; State v. Copling, 326 N.J.Super. 417, 428, 741 A.2d 624 (App.Div. 1999), certif. denied, 164 N.J. 189, 752 A.2d 1290 (2000). Although the State now argues that a passion/provocation manslaughter charge was not required here, the prosecutor did not object to the charge in the trial court so we need not address whether the instruction was required.
[5] In State v. Brooks, 309 N.J.Super. 43, 62-65, 706 A.2d 757 (App.Div. 1998), this court reviewed a claim that the model jury charge on passion/provocation manslaughter in effect at that time also created confusion on the third element. The language in question was strikingly similar to the language challenged here:

Third, you must determine whether the defendant had a reasonable time to cool off; in other words, you must determine whether the time between the provoking event or events, or the acts which caused death, was inadequate for the return of a reasonable person's self control.
[Id. at 63, 706 A.2d 757.]
However, the flaw alleged by defendant in Brooks and considered "unfortunate" by this court lay in the phrase, "you must determine," rather than the language following "in other words," which apparently gave no one cause for concern. Ibid.