┌─────────────────────────────────────────────────────┐
│          **NOT FOR PUBLICATION WITHOUT THE**          │
│        **APPROVAL OF THE APPELLATE DIVISION**         │
│                                                       │
│ This opinion shall not "constitute precedent or be binding upon any court." │
│ Although it is posted on the internet, this opinion is binding only on the │
│ parties in the case and its use in other cases is limited. R.1:36-3. │
└─────────────────────────────────────────────────────┘

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4654-13T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHINUA S. ANDERSON,

    Defendant-Appellant.

_____

Argued October 11, 2016 — Decided  June 8, 2017

Before Judges Sabatino and Nugent.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 11-10-1720.

Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).

Sarah Lichter, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Ms. Lichter, of counsel and on the brief).

PER CURIAM

    Defendant Chinua Anderson seeks to overturn his judgment of conviction for murder and three weapons offenses for which he is

serving an aggregate custodial sentence of thirty years without parole. He argues two points on appeal:

POINT I

THE JURY INSTRUCTIONS SO COMPLETELY SEPARATED THE ISSUES OF SELF-DEFENSE AND JURY DELIBERATION REGARDING THE ELEMENTS OF THE CRIME OF MURDER THAT THE JURY WAS: (1) LEFT WITHOUT PROPER GUIDANCE ON HOW TO DELIBERATE ON THE MURDER COUNT WHILE SIMULTANEOUSLY CONSIDERING THE ISSUE OF SELF-DEFENSE, AND (2) GIVEN WHOLLY CONTRADICTORY INSTRUCTIONS REGARDING THE PROPER VERDICT IN THE CASE. (NOT RAISED BELOW).

POINT II

THE TRIAL COURT'S DECISION TO ALLOW THE JURORS TO TAKE NOTES WHEN THEY RE-VIEWED THE SURVEILLANCE VIDEO WAS AN ABUSE OF DISCRETION; MOREOVER, THE COURT'S FAILURE TO GIVE THE MODEL INSTRUCTION ON NOTETAKING WAS ALSO REVERSIBLE ERROR. (PARTIALLY RAISED BELOW).

For the reasons that follow, we affirm.

On October 18, 2011, a Hudson County grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); third-degree possession of a weapon for an unlawful purpose, a knife, N.J.S.A. 2C:39-4(d) (count two); fourth-degree unlawful possession of a weapon, a knife, N.J.S.A. 2C:39-5(d) (count three); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b) (count four).

Two years later, in December 2013, a petit jury found defendant guilty on the first three counts. Following the verdict,

defendant pleaded guilty to count four in exchange for the State's recommendation of a five-year prison term with five years of parole ineligibility, concurrent with the sentence to be imposed on the murder count.

On December 23, 2013, defendant filed a notice of motion for judgment of acquittal and a new trial, arguing the trial court erred by permitting the jury to take notes while reviewing a video in open court during deliberations. The court merged counts two and three and sentenced defendant to a thirty-year prison term with thirty years of parole ineligibility on count one, murder. In accordance with the plea bargain, the court sentenced defendant on count four to a five-year prison term with five years of parole ineligibility, concurrent to the sentence on count one. The court also imposed appropriate penalties and assessments. This appeal followed.

The State presented the following proofs at trial. On May 2, 2011, at approximately 9:30 p.m., Jersey City Police Officer Gregory Wojtowicz responded to a dispatch of an assault at a liquor store. As he entered the liquor store, he observed a black male, later identified as the victim, lying face down on the floor. Officer Wojtowicz observed no blood, but testified the victim could neither speak nor move. An ambulance transported the victim to the hospital where he was pronounced dead. An autopsy revealed

the victim had been stabbed nine times. The State's expert forensic pathologist testified the cause of the victim's death was multiple stab wounds and the manner of death was homicide. Investigating detectives recovered no weapons from the victim.

While Officer Wojtowicz was at the liquor store, he noticed security cameras inside and outside the store. Upon reviewing the footage, he was able to get a description of the victim and the suspect. A Hudson County Prosecutor's Office detective who had arrived at the liquor store obtained a video copy of the surveillance footage depicting the incident. From still images he printed from the video, the detective was able to observe the suspect from various angles. According to detective, the suspect was "a black male, approximately [five feet and seven inches tall], [with a] bushy beard, black, thick-framed glasses, gold front teeth, wearing a[n] Army-style fatigue jacket, a maroon-colored Yankee baseball hat, [and] carrying a black messenger-type bag with light writing on it." The still images were distributed to other law enforcement officers.

The day after the homicide, two other Hudson County Prosecutor's detectives were driving in the area of Garfield Avenue when they observed defendant standing on a sidewalk. Defendant matched the suspect's description. The detectives exited their vehicle and approached defendant. After explaining why they wanted

4

to speak with him, the detectives showed him a photograph taken from the surveillance video. The detectives asked whether he was the individual in the photograph and where he was the night before. Defendant denied he was the person in the photograph and said he was at a store with his wife the previous night. He also denied possessing any weapons. Defendant phoned his wife, who spoke with one of the detectives to confirm defendant was with her the night before. The detectives photographed defendant and allowed him to leave.

As defendant began walking away, one detective saw a knife blade protruding from defendant's right rear pocket. The detectives arrested defendant, searched him, seized the knife protruding from his pocket, and seized another folding knife concealed on defendant's person. Defendant did not complain of any injuries at the time of his arrest nor were any injuries visible to the detectives.

Following defendant's arrest, law enforcement officers executed a search warrant at defendant's residence.[1] They recovered one green jacket from the living room and another from the bedroom. The jacket seized from the bedroom appeared to

---

[1] On appeal, defendant does not contest the warrant's validity.

contain bloodstains. The officers also recovered a messenger bag matching the one depicted in the liquor store's video surveillance.

The State established through expert forensic testimony that DNA stains on the jacket seized from defendant's bedroom were mixed stains that could exclude neither defendant nor the victim. Another DNA stain taken from the jacket came from defendant. Additionally, through forensic experts, the State established there were DNA stains on the knife protruding from defendant's pocket when he was arrested. The expert testimony linked a DNA stain on the blade to the victim and a DNA stain on the handle to defendant.

Defendant elected to testify. He explained that because he was a commercial truck driver, he carried a knife as part of his job to cut boxes, cords or plastic. Sometime during the "[a]fternoon or evening" of May 2, 2011, he walked to a wholesale store to "kill time." He was wearing a green jacket, jeans, and a baseball cap. He had also gone to Shoprite. He was carrying a plastic grocery bag and a messenger bag.

While on his way home, defendant stopped at the liquor store to pick up juice for his wife. He had a conversation with a woman in front of the liquor store, and he interacted with a few people inside the store. He was in a good mood at that time and shook hands with a few patrons before leaving the store.

A-4654-13T3

As defendant left the liquor store, he encountered the same woman outside. She appeared slightly "incohesive [sic] and intoxicated." Defendant conversed with the woman and told her he had no change to give her. He went back into the store to get confirmation from the clerk that he did not receive any change from his transaction. He exited the store and again explained to the woman that he had no change.

As defendant walked away from the liquor store, he encountered a man who appeared intoxicated. Still concerned for the woman, defendant asked the man whether he had any relation to her. Defendant spoke with the man for a few minutes before accompanying him back to the liquor store.

On his way back to the liquor store, defendant testified someone, who turned out to be the victim, suddenly "came out of nowhere" at a fast, aggressive pace. Defendant stated he did not know the victim, whom he described as bigger than himself. Defendant testified the victim "came right up to [his] face" and began arguing with him. Defendant then observed the victim raise a metallic object in his hand as if to strike defendant. In response, defendant grabbed his knife and swung it at the victim in an attempt to disarm him.

Defendant and the victim fought. Defendant believed the fight lasted between two and three minutes, and though he claimed

A-4654-13T3

the victim was the aggressor, defendant admitted to stabbing the victim multiple times. Defendant did not believe he caused any injuries to the victim at that time, nor did he hear the victim cry out in pain.

Defendant followed the victim into the liquor store to ensure that he would not pursue him upon leaving the area. Defendant admitted that he was the individual on the liquor store's security footage, but claimed the footage captured only a portion of the fight. After defendant saw the victim fall, he grabbed his belongings and ran from the store. He did not wait for police to arrive because he was afraid others in the liquor store would pursue him.

Defendant ran home but claims he did not call the police because he was too shaken up. Although defendant dropped the knife on the night of the incident, he retrieved it the next day before encountering the detectives who arrested him. Defendant admitted, in hindsight, he could have escaped without stabbing the victim.

During the charge conference, the trial court stated it had "reordered the charge . . . and moved up credibility after expert witnesses, followed by statements of the defendant, stipulations, character witnesses, if . . . necessary; identification, self[-]defense and then the substantive charges." Neither the State nor

A-4654-13T3

the defense objected. The trial court agreed to charge passion/provocation manslaughter as requested by defendant, notwithstanding defense counsel's statement he would probably not argue that to the jury. In his summation, defense counsel argued defendant acted in self-defense and that the State had the burden to disprove this defense beyond a reasonable doubt.

During the jury charge, the judge instructed the jury on self-defense. The judge's instruction tracked the model jury charge. The judge explained, among other things:

> Burden of proof. The State has the burden to prove to you beyond a reasonable doubt that the defense of self-defense is untrue. This defense only applies if all of the elements previously described exist.
>
> . . . .
>
> If the State carries its burden then you must disallow the defense. If the State does not satisfy this burden and you have . . . a reasonable doubt[,] then it must be resolved in favor of the defendant and you must allow the claim of self-defense and acquit the defendant.

Immediately after this instruction, the judge instructed the jury on the elements of murder and passion/provocation manslaughter. The judge told the jury, among other things, "[a] person is guilty of murder if he, one, caused the victim's death or serious bodily injury that then resulted in death. And, two, that the defendant did so purposely or knowingly. And, three, did

A-4654-13T3

not act in the heat of passion resulting from a reasonable provocation." In addition, the judge stated:

> The third element that the State must prove beyond a reasonable doubt to find the defendant guilty of murder is that the defendant did not act in the heat of passion resulting from a reasonable provocation. Passion provocation manslaughter is a death caused purposely or knowingly that is committed in the heat of passion, resulting from a reasonable provocation.

After explaining the four factors that distinguish passion/provocation manslaughter from murder, the judge instructed the jury that if it determined the State had disproved passion/provocation manslaughter beyond a reasonable doubt, "and in addition . . . you determine that the State has proven beyond a reasonable doubt that the defendant purposely or knowingly caused death or serious bodily injury resulting in death[,] you must find the defendant guilty of murder." The judge further instructed the jury that if it determined the State had not disproved passion/provocation manslaughter beyond a reasonable doubt, then it should find defendant guilty of passion/provocation manslaughter.

The judge next instructed the jury on aggravated and reckless manslaughter. Thereafter, the judge instructed the jury on the elements of the weapons offenses.

10

Near the conclusion of the judge's instruction regarding possession of a weapon for an unlawful purpose, the judge reminded the jury of defendant's main argument, namely, that he used the knife to defend himself. Specifically, the judge stated, "if the defendant had an honest though unreasonable belief that he needed to use the weapon to protect himself, this negates the purposeful mental state required for [possession of a weapon for an unlawful purpose]." Additionally, the judge stated:

> [e]arlier in this charge I instructed you on the concept of self-defense as it applies to the offenses of murder, passion provocation manslaughter, aggravated manslaughter, and reckless manslaughter. The concept of self-defense as it applies to those offenses is different than that of protective purpose that applies to [possession of a weapon for an unlawful purpose] . . . . [w]hen applied to those offenses[,] self-defense requires a defendant to have an honest and a reasonable belief in the need to use force.

During deliberations, the jury requested to see the liquor store's video surveillance footage, which the State had played during the trial. The jury also asked for permission to take notes while watching the video. Defense counsel did not object to allowing the jury to review the footage; however, he objected to the jurors taking notes because the judge had not allowed the

11

jury to take notes during trial.[2]  The judge allowed the jury to take notes because they were in the midst of deliberations, rather than at trial.  In addition, the judge instructed the jury not to give undue weight to the surveillance footage.  The judge read the model charge on the playback of testimony.

As previously noted, the jury found defendant guilty on the first three counts, and defendant pleaded guilty to the fourth. After the court denied defendant's motion for a new trial and sentenced him, defendant filed this appeal.

Defendant first argues the order of the jury instructions, specifically the jury charge on self-defense, denied him due process.  He argues that because the self-defense charge was placed separately from the jury instruction on murder, the jury was given no guidance on how to deliberate on the murder count, and was instructed on the elements of murder "without ever considering self-defense."

Indisputably, jury charges "must provide a 'comprehensive explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the

---

[2] During the jury instruction before opening statements, the judge instructed the jury that they were not permitted to take notes. The judge stated the jurors should "depend upon the combined recollection of all the jurors than upon notes taken by one or more of them."

jury may find.'" State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). Because clear and correct jury charges are essential to a fair trial, State v. Adams, 194 N.J. 186, 207 (2008), "erroneous instructions on material points are presumed to possess the capacity to unfairly prejudice the defendant." State v. McKinney, 223 N.J. 475, 494 (2015) (citations omitted). However, an error in the charge that could not have affected the jury's deliberations does not amount to reversible error. State v. Docaj, 407 N.J. Super. 352, 366 (App. Div.), certif. denied, 200 N.J. 370 (2009). In that regard, "[i]f the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." Singleton, supra, 211 N.J. at 182.

Here, defendant did not object to the self-defense charge, nor did he raise the issue he now raises on appeal. Because defendant did not object at trial, we review the charge for plain error. R. 1:7-2; R. 2:10-2; McKinney, supra, 223 N.J. at 494. Plain error in this context is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Adams, supra, 194

N.J. at 207 (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). When reviewing a charge for plain error, an appellate court must not examine the "portions of the charge alleged to be erroneous in isolation; rather, 'the charge should be examined as a whole to determine its overall effect.'" McKinney, supra, 223 N.J. at 494 (quoting Jordan, supra, 147 N.J. at 422).

Applying these principles to the case now before us, we conclude it was not plain error to structure the charge in the manner the trial court structured it. The trial court made clear at the outset of its charge on the substantive offenses, as to which defendant was claiming self-defense, that the State had the burden of disproving self-defense beyond a reasonable doubt. Immediately following the self-defense charge, the court instructed the jury on the elements of murder and manslaughter. Near the end of the charge, the court reminded the jury that earlier in the charge the court had "instructed you on the concept of self-defense as it applies to the offenses of murder, passion provocation manslaughter, aggravated manslaughter, and reckless manslaughter." The court thus harkened back to the portion of the charge in which the court had instructed the jury on the elements of self-defense and the State's burden of disproving the defense beyond a reasonable doubt. Considering the self-defense charge

in the context of the overall instructions, we conclude the trial court did not commit plain error.

Our conclusion is fortified by the presumption - the charge was not error and was unlikely to prejudice defendant's case — arising from trial counsel's failure to object. <u>Singleton</u>, <u>supra</u>, 211 <u>N.J.</u> at 182. In summation, defense counsel told the jury, "there's no secret here. . . . [W]e're submitting that he acted in self-defense." Defense counsel further emphasized:

> Not only does the State have to prove that there was a murder. That will be part of the instructions. The State has to prove that it wasn't passion[/]provocation. Okay? That he wasn't just incited but it was still a murder except for passion[/]provocation. The State has to prove all those things to you.
>
> And, on top of that, I don't have to convince you that it was self-defense. The State has to convince you beyond a reasonable doubt that it was not self-defense. Once again, just because we're advancing this defense . . . it's still the burden of the prosecution to come forward with evidence to convince you - - to leave you firmly convinced that it wasn't self-defense.

Defense counsel continued throughout his summation to emphasize defendant acted in self-defense, and the State had failed to carry its burden of disproving self-defense beyond a reasonable doubt. It is inconceivable that had defense counsel believed the jury charge somehow confused or prejudiced defendant's sole defense, he would not have lodged an objection.

Defendant relies on State v. Coyle, 119 N.J. 194 (1990), for the proposition that the self-defense charge given in this case should have been incorporated within the murder charge. We disagree with defendant's argument that the failure to do so constitutes reversible error.

In Coyle, our Supreme Court addressed in a capital murder case a trial court's obligation to clearly instruct the jury, when the evidence so requires, on the State's obligation when seeking a murder conviction to disprove "beyond a reasonable doubt that the purposeful killing was not the product of passion/provocation." Id. at 221. The Court noted that "[i]f there is sufficient evidence of passion/provocation, a trial court must instruct the jury that 'to find murder it must be convinced beyond a reasonable doubt that the accused did not kill in the heat of passion . . . .'" Id. at 221-22 (quoting State v. Grunow, 102 N.J. 133, 145 (1986)). The Court further noted the trial judge:

> instructed the jury that if it found beyond a reasonable doubt that the killing was purposeful, it should convict defendant of murder. Nowhere in the initial charge concerning purposeful murder did the court refer to the State's burden of disproving passion/provocation beyond a reasonable doubt. The trial court's initial charge concerning purposeful murder failed to make clear that if there is evidence of passion/provocation, a jury cannot convict for murder without first finding that the defendant did not kill in the heat of passion.

16

[<u>Id.</u> at 222.]

Although the trial judge in <u>Coyle</u> later instructed the jury on the role of passion/provocation, the Supreme Court deemed the belated charge ineffective, particularly because the trial judge had explained in the initial charge on purposeful murder that the jury need not consider the lesser-included offenses of aggravated manslaughter or manslaughter unless it determined that the State had failed to prove murder beyond a reasonable doubt.  <u>Ibid.</u>

In contrast to <u>Coyle</u>, here, in the initial charge, the court clearly and unambiguously instructed the jury on the law of self-defense.  No confusion occurred by reason of the court giving sequential charges on self-defense, murder, and manslaughter. Significantly, the Court in <u>Coyle</u> explained:

> [t]here is nothing inherently wrong with a sequential charge. Such charges assure that a jury renders a just verdict by applying the facts to the law as it is charged.  Indeed, there is nothing inherently wrong with the model charge for purposeful murder. Absent evidence of passion/provocation, sequential charges usually provide a framework for orderly deliberations.

> [<u>Id.</u> at 223 (citations omitted).]

We have concluded no plain error occurred as the result of the trial court sequentially instructing the jury on self-defense, murder, manslaughter, and the weapons offenses.  Nonetheless, the better practice would have been to remind the jury, while

instructing on the elements of murder and manslaughter, that the State also had to disprove self-defense beyond a reasonable doubt. After so instructing the jury, the court could have explained that if the jury determined the State had proved the elements of the substantive offense beyond a reasonable doubt and also disproved self-defense beyond a reasonable doubt, the jury should return a verdict of guilty on the substantive offense.[3]

Defendant next argues the trial court abused its discretion by allowing the jury to take notes while re-viewing the liquor store's video surveillance footage in the midst of deliberations. Defendant concedes that replaying the video to the jury was proper. Defendant's argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We add the following brief comments.

The decision to permit jurors to take notes lies within the discretion of the trial court. State v. Jumpp, 261 N.J. Super. 514, 526-27 (App. Div.), certif. denied, 134 N.J. 474 (1993). The case now before us is somewhat unusual because the trial court did not permit jurors to takes during the trial, but allowed them to take notes while they viewed the surveillance video in open court following deliberations. Nonetheless, the court cautioned the

---

[3] We refer this issue to the Committee on Model Criminal Jury Instructions for consideration.

jury not to give undue weight to the surveillance footage and to consider all the evidence. And defendant has offered no evidence, other than speculation, of "any prejudice produced by allowing the jurors to take notes." Id. at 527. Furthermore, the court found "no evidence of confusion, distraction or prejudice caused by juror note-taking . . . which would warrant a reversal of defendant's convictions." Ibid.

Moreover, even if the trial court erred by permitting the jurors to take notes, the error was harmless. An error will not lead to reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2. Thus, even if an alleged error was brought to the trial judge's attention, it will not be grounds for reversal if it was "harmless error." State v. Macon, 57 N.J. 325, 337-38 (1971).

Trial errors have an effect that may "be quantitatively assessed in the context of other evidence presented in order to determine whether [they are] harmless beyond a reasonable doubt." Arizona v. Fulminante, 499 U.S. 279, 307-08, 111 S. Ct. 1246, 1264, 113 L. Ed. 2d 302, 330 (1991). In addition, a reviewing court can consider its assessment from the record of witnesses' credibility in determining whether an error is harmless. See State v. J.R., 227 N.J. 393, 420 (2017).

Here, a considerable quantum of evidence — including forensic testimony, DNA evidence, and surveillance — established defendant was the man who repeatedly stabbed the victim. Defendant's credibility was impeached not only by his initial denials to police that he was not the man in the surveillance video, but also by the surveillance video itself. The video depicted defendant persistently and aggressively pursuing and lunging at the unarmed victim as the victim persistently attempted to retreat from and avoid defendant's attack. One might aptly characterize defendant's self-defense testimony and argument to the jury as "don't believe your lyin eyes." Defendant's testimony concerning why he pursued the victim into the store bordered on frivolity. In short, defendant's testimony was manifestly incredible. Even if the trial court erred when it permitted the jury to take notes when it viewed the surveillance during deliberations — and we do not so conclude — the error was harmless beyond a reasonable doubt.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4654-13T3