**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2855-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RICHARD SANTIAGO, a/k/a
RICHARD A. SANTIAGO,
RICHARD R. SANTIAGO,
RISCALDO A. SANTIAGO,
and RICHY,

     Defendant-Appellant.

_____

          Submitted November 5, 2018 – Decided  November 28, 2018

          Before Judges Sabatino and Haas.

          On appeal from Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 13-09-0929.

          Joseph E. Krakora, Public Defender, attorney for appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the briefs).

Charles A. Fiore, Gloucester County Prosecutor, attorney for respondent (Staci L. Scheetz, Senior Assistant Prosecutor, on the brief).

PER CURIAM

Following a six-day trial, a jury found defendant Richard Santiago guilty of stabbing a woman to death in her apartment. The woman had testified against defendant years earlier at a criminal trial, at which he was convicted of a second-degree crime and sentenced to nine years in prison. While defendant was detained on a parole violation, he made three recorded phone calls to his sisters and niece, in which he repeatedly admitted to killing the victim. At trial, the State presented these recordings as well as circumstantial proof of defendant's guilt, including video surveillance footage and a bag that defendant carried to and from the crime scene.

On appeal, defendant mainly argues he is entitled to a new trial because the trial court declined to issue a requested corroboration charge. He further contends his trial was unfair because the court allowed testimony from two people who conversed with the alleged killer before he entered the apartment building, admitted unduly prejudicial photographs, and failed to adequately sanitize the contents of his phone calls. Lastly, defendant argues the jury pool

2

could have been tainted by possibly observing an ankle bracelet on his leg when he was in the courtroom during jury selection.

For the reasons that follow, we affirm defendant's conviction.

I.

The State's proofs at trial were essentially as follows.

At approximately 8:30 p.m. on December 17, 2012, police were dispatched to Ramona Johnstone's apartment in Woodbury "[f]or a report of an unconscious person." Johnstone was "slouched over" on a cot and "appeared to be deceased." When medical personnel arrived, they observed "some slight blood on her neck and . . . a blood spot on her sweater mid-sternum, center chest." They discovered "multiple puncture wounds on her abdomen and on her body." Lifesaving measures were performed before the victim's body was transported to the hospital.

An autopsy report revealed fifteen stab wounds, a three-inch long abrasion over the left collarbone, a scratch on the forearm, and a broken rib. Gerald Feigin, M.D., the medical examiner, determined the manner of death was homicide and the cause of death was multiple stab wounds, one of which struck the victim's heart. Dr. Feigin testified that the wound to the heart "would have been the most rapidly fatal." Over objection, the State presented to the jury

A-2855-16T1

several photographs of the stab wounds in connection with Dr. Feigin's testimony.

Michael Wilson was at Johnstone's apartment when police arrived. He appeared to be intoxicated. Wilson testified that, in exchange for "taking care of her," Johnstone would let him stay at her apartment "from time to time."[1]

Wilson saw Johnstone before he left for the store on the morning of December 17, 2012, and again after helping a maintenance employee at the apartment building, Ervin Richard Bemsderfer, work on his car for most of the day. Wilson and Bemsderfer then drank beer in Bemsderfer's apartment, which was located directly underneath Johnstone's.

When Wilson went to visit Johnstone later that evening, he found her deceased. He checked for a pulse but there was none. He testified, "I got scared. I walked out, finished my beer and I went back in because leaving her would be wrong, so I went back in and called 911." When Wilson went back in, he also took $40 out of Johnstone's pocketbook.

Reyna Salazar was living at the apartment complex at the time of Johnstone's murder. At approximately 6:30 p.m. that evening, a man approached

---

[1] There is evidence that Johnstone was in poor health at the time of her murder. Wilson testified that she weighed about ninety pounds, and photographs of her apartment showed a wheelchair and several walkers.

A-2855-16T1

her and her sons Brian and Jason. She described him as "tired," "desperate," and "not well groomed." Over defendant's objection, Mrs. Salazar recounted to the jury her conversation with the man wherein he asked her if she "knew a person he was trying to find." She could not recall which name the man gave her or provide a description of him. She did remember, however, that he was carrying a bag, although she was unable to confirm that was a red bag later confiscated by police.

Brian Salazar also testified for the State. He recounted that he and his mother were approached by a man outside the apartment building sometime between 6:00 and 7:00 p.m. that evening. The man asked if they knew a lady, to which they responded they did not. The man first posed this query in English and then in Spanish to Brian's mother. Brian recalled the man told them he was looking for someone "from Vietnam" and that he had lived at the apartments twenty-five years earlier. He stated the man was holding a bag, which he remembered as being a "darkish" color.

Outdoor video surveillance from the apartment complex corroborated the interaction at that time between a man and the Salazars. Reyna and Brian Salazar were shown a photographic lineup that included defendant. However, neither was able to identify him.

A-2855-16T1

After the attack of the victim, defendant traveled about a mile down Broad Street to the house of his daughter-in-law, Dionne Lee Santiago. Portions of defendant's route on foot were filmed by video surveillance from local businesses along Broad Street. Dionne testified defendant visited her home in Woodbury on or around December 17, 2012,[2] supposedly to see his grandchildren. Defendant visited in the "evening," and remained for about forty-five minutes. She testified defendant had with him a plastic shopping bag containing presents for his grandchildren.

Defendant then went to the house of Robert Shaffer, who was in a relationship with one of his sisters, to spend the night of December 17. Shaffer confirmed defendant stayed over with him that night.

The next morning, defendant and Shaffer went to the home of defendant's sister, Amelia ("Miriam") Santiago-Wise,[3] so that defendant could change his clothes. According to Shaffer, defendant grabbed a trash bag and went upstairs to change his clothes. He came down in different clothes holding the bag,

---

[2]  Dionne Santiago gave a statement to police on December 28, 2012, in which she indicated that defendant had visited her on Monday, December 17, 2012. However, she testified at trial that she was never certain as to that specific date.

[3]  Miriam is a nickname for Amelia Santiago-Wise.

possibly containing the clothes he had been wearing. Defendant explained that he "had shit himself."

Defendant and Shaffer left Miriam's house and headed towards a convenience store, so that Shaffer could use a cash machine. As they approached the store, defendant crossed the street, leaving Shaffer. According to Shaffer, when defendant entered the convenience store, he no longer had the bag with him.[4]

Miriam Santiago-Wise testified that defendant and his daughter were living with her in December 2012. However, Miriam had a dispute with defendant over his daughter, which resulted in him leaving the home. Miriam confirmed that defendant returned to her home with Shaffer on December 18.

The video footage depicting the alleged killer's encounter with the Salazars, and his progress down Broad Street, shows him in possession of a bag. The prosecution asserts that bag was recovered by an investigating detective at Shaffer's home. It was described as a "red, flowered tote bag." The bag contained personal items, eighteen containers of medication bearing defendant's name, and a wet washcloth with brown and red stains. Testing identified the

---

[4] During the investigation, a detective thereafter searched a nearby dumpster for "a black trash bag that contained clothing." However, she "located nothing of evidentiary value."

source of the major DNA profile collected from the bag as matching the DNA of defendant.  No fingerprints, DNA, or other physical evidence was ever found at Johnstone's apartment linking defendant to the crime.

After he was arrested for a violation of parole, defendant made three separate telephone calls to family members from prison.  Defendant called his sister Audalina ("Tata") Ruiz-Santiago[5] on March 7 and again on March 27, 2013.  Another sister, Fedora Hawkins, and Marilyn Ibarrondo, defendant's niece, received a call from him on April 11, 2013.  During each of those calls, defendant repeatedly confessed to having killed a woman.  The calls, with certain redactions, were played for or read to the jury.[6]  The jury was provided with transcripts of those calls, with translations of the Spanish portions.

The evidence of defendant's three recorded phone calls to his relatives from prison was especially incriminating.  At the outset of each call, an operator states that the call "may be monitored or recorded."  During the first call on March 7, 2013, defendant initially conversed with his sister Tata about the recent death of her husband.  He then admitted to Tata that he "did something real

_____

[5]  Nicknamed Tata.

[6]  The March 27 call, as redacted, was read aloud to the jurors by the judge's law clerks due to technical difficulties in redacting the sound recording.

stupid." When Tata asked him whether he had killed "that woman," defendant responded in Spanish (translated) "Yes, yes, I did her. I did it." He acknowledged, in translated Spanish, "Now, now I have to pay with my life, but that's OK . . . I wasn't doing anything out there anyway. I was dying out there anyway." Later in the call, defendant reiterated that he had killed the victim, stating in English, "I did it, I did it."

During defendant's second call to Tata on March 27, the two of them initially talked about other family members and the recent deaths of another relative or acquaintance and also of Tata's pit bull. Defendant then repeatedly acknowledged to Tata that he had killed the victim. He admitted that he had gone over to her apartment, lost his temper, and hurt her because of something she said to him and her testimony at his previous criminal trial. The following excerpts of the March 27 phone conversation (as translated at points into English) are especially salient:

> ["D"]: Yeah. What else can I do?
>
> ["TS"]: Oh, you killed her?
>
> D: Yes, I did.
>
> TS: Well, what did you -- for what did you do that? did you do that? Aren't you stupid or what?

9

D: I -- I don't know.  I wasn't thinking at the time. I was all --

TS: That's very stupid.

D: I know.  I know.  I wasn't thinking at the time, you know?

TS: You're going to say you're guilty so that they can give you more time.

D: What's that?  I can't hear you.

TS: Why, why you want to be -- you're going to -- you -- you did it and you're going to stay there 40 years.

D: I know. I'm -- want to die here. I told you that.

     . . . .

TS: It wasn't nice of you.  You did eight and a half years and now you're going to do more years.  You know, that's stupid of you; okay?

D: I know it was stupid.  I lost my --

TS: It was very stupid of you.

D: I lost my temper talking to her.

TS: No, you didn't lose temper.   You wanted to do it.

D: No, I didn't want to do it.  They might give me the --

TS: Okay.  The drugs.  The drugs, the liquor and everything controls you.

A-2855-16T1

D: They want -- they probably going to kill me. They going to give me the execution.

TS: Who?

D: Over here.

TS: They said? Well, that's good for you because you deserve it.

D: You think I deserve it?

TS: Yes. Why you kill somebody.

D: I know. I don't -- I don't know why. I don't know.

TS: Are you supposed to take somebody else's life?

D: I know. I don't -- I don't know why I did it. I was crazy.

TS: Um-hum.

D: I was crazy. I told you.

TS: Uh-huh.

D: You're not going to -- you're not -- you're not going to --

TS: Well, you're -- you're getting what you deserve.

D: You're not going to forgive me?

TS: I know. Uh-huh.

D: So I just wanted you to forgive me anyway.

11

TS: So it's not my fault.

D: I know it's not. I know it's not your fault, Miriam's fault. It's nobody's fault.

    . . . .

TS: What did you do that lady? What did she do to you so you hurted [sic] her that way?

D: She lied. She went and testified in court. She lied.

TS: Ah, no, she didn't --

D: She was. She wasn't even there.

TS: -- say nothing in court that day.

D: She wasn't even there when I -- when that happened to that guy. She lied there. She wasn't there.

TS: Okay. Why? Why did you have to go to her apartment? Why? Did she invite [sic] to her apartment?

D: Yes. Yes, I didn't break in. She invited me in.

TS: What for?

D: To talk to me.

TS: Uh-huh.

D: And then I lost my temper. She said; "You're that stupid Mexican I sent away."

TS: What he -- what she say?

12

D: She said; "You're that stupid Mexican I sent away."

TS: Um-hum.

D: You know?

TS: And that's why you killed her?

D: Yeah. I pretty much lost my temper.

TS: Uh-huh. Well, how -- where was her boyfriend? Was he there?

D: No, he wasn't there.

TS: He wasn't there?

D: I don't think so. I don't know. Maybe he was. I don't know. I didn't care.

TS: And who killed her; her boyfriend or you?

D: Her boyfriend killed her, I think.

TS: You just told me you did it.

D: Yeah, I know. I'm sick.

[(Alteration in original).]

In the third call on April 11, defendant made further admissions to his sister Fedora and to her daughter Marilyn Ibarrondo. While speaking with Fedora, defendant said that he would tell the truth, although he wanted to avoid hurting his family, and said, "I realize that I do stuff without even thinking about

A-2855-16T1

it. I think . . . something's wrong with me." Referring to his own daughter, he said, "she's better off without me," adding, "She never really needed me anyway . . . . I was gone too, too long."

Marilyn took the phone and stated, "You know, you hurt[ ] us," which defendant acknowledged. Marilyn said, ". . . you went ahead and did this . . . ," to which defendant replied, "I don't know what I was thinking. I got there, I started talking to her . . . . I didn't break in, she invited me in . . . 'Cause I wanted to know why she lied in [sic] the stand and send me away for nine years." Marilyn replied that defendant could have come to her and her mother, because he "needed to go to a rehab program . . . ," adding, "this one was a costly mistake. It affected all of us." She continued, "[A]fter you had gotten out of [rehab or prison] you'd been clean for a long time . . . But, no, because, you know old habits are hard to die . . . . [N]obody wanted to hire you . . . . But you needed to get rehabilitated all over again . . . ." She continued, "That was a heinous crime . . . . You know I love the hell out of you. But I'm mad at you at the same time," to which defendant replied, "I'm sorry for everything . . . . I wish I could bring her back. I don't know what got into me."

Without prompting, defendant said to Marilyn, "I don't know, I snapped, she said, 'You were the dumb Mexican I send [sic] away,' and that's when I

14

snapped." He continued, "I didn't mean to kill her . . . . It just happened so fast," adding, in response to a question, that he had been "taking some Oxycontin."

Before the start of trial, the defense moved to suppress the phone calls. Defense later clarified for the record that portions of the phone calls involve character evidence, including references to "whether he was a good brother," "a good family member," or "just a good person in general." Furthermore, defense raised the issue that the calls reveal he was incarcerated when the calls took place. The court determined that the conversations were admissible under N.J.R.E. 803(b)(1), as statements by party-opponent. The court found the fact that defendant was in custody when making the calls was also admissible. The court noted, "They were statements made that were recorded. He was warned prior to the recording that they may be recorded." However, the court indicated it would ask "for a proposed instruction to the jury, as to his reason for being in custody." As the court reasoned:

> They [the phone calls] all go to show his motive, intent and at – and a confession of what took place. The fact that he was in custody, that he was calling his sisters during that period of time, it shows the full content of the conversation and it tends to prove on the part of the State the voluntariness of the statements themselves.

The court also found statements made during the calls about defendant's character were admissible. "I think that that is admissible to show the jury the

15

contents[7] of the conversation[s] and it – of the confession and of the – of his approach to the questions that were being asked."  The court indicated it was willing to provide a curative instruction.

At the end of the trial day on May 11, 2016, defense counsel indicated that she would prepare a limiting instruction with respect to the character evidence and present it to the prosecution, since the State intended to admit the calls into evidence the next day.  The next day, defense counsel changed her position.  She did not submit a limiting instruction, explaining she "would not be able to prepare one that would be able to correct the prejudice to the client[.]"

Before playing the phone calls or having them read aloud to the jury, the court provided the following instructions:

> Now, we're ready to proceed but before the next witness is called, you are about to hear evidence that the defendant was incarcerated at the time he made certain phone calls.
>
> You are to draw no negative inference from the fact of his incarceration.  You may not speculate as to the reason for his incarceration.
>
> You may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person.  That is, you may not decide that just because he was incarcerated, he must be guilty of the present crime.

---

[7]  It is conceivable the court meant to say "context."

16

I have admitted the evidence only to provide you with the location of the discussions, to assist you in . . . the understanding of the context and the background of them.

You may not consider it for any other purpose and may not find the defendant guilty now simply because the State has offered evidence that he was incarcerated.

The defense also objected to the admission of various photographs of Johnstone's apartment, in which walkers, a wheelchair, and images, presumably of Johnstone's family, were visible. Defendant argued the photos were overly prejudicial. The court overruled these objections, finding the photographic proof "shows the way the apartment appeared at the time of the event." As for the photographs in which images, presumably of Johnstone's family were visible, the court determined "the State is entitled to prove that [the victim] was a person living in a particular location, in order to give them an overview of the room itself, so I'm going to overrule the objection. I don't find them unduly prejudicial."

Defendant declined to testify, and he did not call any witnesses in his defense. His counsel's main theme in closing argument was that the State had failed to prove beyond a reasonable doubt that he was the assailant who stabbed Johnstone to death. Defense counsel suggested the actual killer could have been

17

Wilson, who had been in the victim's apartment that night, stole money from her, lied to the police, and who, the defense argued in closing, had a motive to take her life.

Defense counsel also stressed to the jury that defendant's blood, fingerprints, and DNA had not been found at the victim's apartment, and that no one, including the Salazars, positively identified him as the perpetrator. Counsel argued the seized red bag contained no incriminating evidence and that the knife used in the attack was never recovered. Counsel further maintained the grainy videos do not clearly identify defendant as the person walking from Broad Street, and the video of him and Shaffer on the street is not inculpatory because there was no proof of the contents of the black trash bag he is seen holding.

With respect to defendant's three phone calls from prison to his family members, defense counsel argued his statements about the killing were non-specific, at times inconsistent, and there were no details or corroboration. In particular, counsel noted defendant does not state how the victim was killed, what weapon was used and what happened to it, or other details. Counsel suggested defendant falsely stated to his family members that he had committed the murder in order to "save his family from the pain of thinking that he's in prison for something that he didn't do."

18

On the second day of deliberations, the jury requested to hear again the evidence of defendant's three phone calls, and also requested to review in the jury room the surveillance videos. The court advised the jurors they could watch the videos in the jury room, but they would have to return to the courtroom for a playback of the telephone calls. The jury did not request to return to the courtroom to re-hear the phone recording evidence. Several hours later, the jury ended their deliberations and returned their verdict. The jury found defendant guilty of purposeful and knowing murder, N.J.S.A. 2C:11-3(a)(1), and hindering apprehension, N.J.S.A. 2C:29-3(b). The jury found defendant not guilty of a "certain weapon" offense, N.J.S.A. 2C:39-4(d).

The trial court sentenced defendant, who had four prior indictable convictions and who had been released from prison only seven months before murdering Johnstone, to a sixty-year custodial term. Defendant does not argue the sentence was illegal or excessive. This appeal ensued.

Defendant presents the following points in his brief:

POINT I

THE TRIAL COURT ERRED TO DEFENDANT'S PREJUDICE IN REJECTING HIS REPEATED REQUEST FOR A JURY CHARGE AS TO CORROBORATION. U.S. CONST., AMEND. XIV; N.J. CONST. (1947), ART. 1, PAR. 10.

POINT II

THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE IN ADMITTING TESTIMONY CONCERNING PREJUDICIAL STATEMENTS PURPORTEDLY MADE BY DEFENDANT WITHOUT REQUIRING PRIMA FACIE PROOF THAT THE DEFENDANT WAS THE SPEAKER.

POINT III

THE TRIAL COURT ERRED TO DEFENDANT'S PREJUDICE IN ADMITTING, AND FAILING TO ADEQUATELY SANITIZE, THE TELEPHONE CALLS INTRODUCED BY THE STATE.

A. References to Defendant's Imprisonment

B. Evidence of Defendant's Purportedly Bad Character

POINT IV

THE STATE WAS PERMITTED TO INTRODUCE PHOTOGRAPHS OF THE CRIME SCENE AND VICTIM THAT WERE IRRELEVANT OR CUMULATIVE, AND HIGHLY PREJUDICIAL.

A. Photographs of Victim's Apartment

B. Autopsy Photographs

POINT V

THE TRIAL COURT ERRED TO DEFENDANT'S PREJUDICE IN DECLINING TO EXCUSE JURY PANELS WHOSE MEMBERS HAD BEEN EXPOSED TO DEFENDANT WEARING A

RESTRAINT. U.S. CONST., AMEND. XIV; N.J. CONST. (1947), ART. 1, PAR. 10.

POINT VI

REVERSAL IS NECESSITATED BY THE CUMULATION [SIC] OF ERROR IN THIS CASE.

II.

A.

Defendant's primary argument on appeal is that the trial court wrongfully rejected his counsel's requests for a jury charge instructing that his confessions need to be corroborated to be admissible.  Although we agree with defendant that a corroboration charge was appropriate in this case, we conclude he is not entitled to a new trial because of the omission of such a charge.

In Smith v. United States, 348 U.S. 147, 152-53 (1954), the United States Supreme Court recognized that, at times, a person may confess to a criminal act yet not actually be guilty of such wrongdoing.  The Court referred to "a long history of judicial experience with confessions and . . . the realization that sound law enforcement requires police investigations which extend beyond the words of the accused."  Id. at 153.  "Confessions may be unreliable because they are coerced or induced, and although separate doctrines exclude involuntary confessions from consideration by the jury [citations omitted], further caution is

warranted because the accused may be unable to establish the involuntary nature of his statements." Ibid. "Moreover, though a statement may not be 'involuntary' within the meaning of [the] exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation -- whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past." Ibid. (emphasis added). The Court added that "the experience of the courts, the police and the medical profession recounts a number of false confessions voluntarily made[.]" Ibid. (citation omitted).

In light of these considerations, the Supreme Court in Smith extended to non-capital cases the "general rule that an accused may not be convicted on his uncorroborated confession[.]" Id. at 152, 154. The Court did so because institutional experience with false confessions "is not shared by the average juror." Id. at 153. The Court cautioned that, "Nevertheless, because this rule does infringe on the province of the primary finder of facts, its application should be scrutinized[,] lest the restrictions it imposes surpass the dangers which gave risk to them." Ibid. On the facts in Smith, a criminal tax prosecution, the Court upheld a defendant's conviction that had been based in part upon incriminating submissions he had made to Government agents about his net

22

worth and the amount of tax he thought was due, because there was sufficient independent evidence to corroborate his guilty. Id. at 159.

The New Jersey Supreme Court has applied these principles, endorsing a jury instruction on corroboration to explain to jurors that an uncorroborated confession is insufficient to establish a defendant's guilt. In State v. Lucas, 30 N.J. 37, 62-64 (1959), the Court approved such a jury charge, but clarified that the "corroborative proofs need only establish the trustworthiness of the confession and not the corpus delicti," i.e., the fact of the crime. As the Court observed in Lucas:

> Confessions, like other admissions against interest, stand high in the probative hierarchy of proof. It is for this reason that the law imposes various safeguards designed to assure that the confession is true. But safeguards for the accused should not be turned into obstacles whereby the guilty can escape just punishment. No greater burden should be required of the State than independent corroborative proof tending to establish that when the defendant confessed he was telling the truth, plus independent proof of the loss or injury.
>
> [Id. at 57-58 (emphasis added).]

Subsequent reported opinions in our State have continued the judicial approval of a corroboration charge. See, e.g., State v. Reddish, 181 N.J. 553, 621 (2004);

State v. Di Frisco, 118 N.J. 253, 274 (1990); State v. Brooks, 309 N.J. Super. 43, 57 (App. Div. 1998).

The Court's omission of an appropriate corroboration charge does not, however, automatically require a new trial. We must be guided by the principles of Rule 2:10-2, which prescribes that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." (Emphasis added). Even when a party has brought an alleged error to the trial court's attention, the error "will not be grounds for reversal [of on appeal] if it was 'harmless error.'" State v. J.R., 227 N.J. 393, 417 (2017) (quoting State v. Macon, 57 N.J. 325, 338 (1971)). In order for an error to be reversible under the harmless error standard, "[t]he possibility [of the error leading to an unjust result] must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

Here, defendant stresses that we are not guided by a "plain error" standard of review, because his trial counsel twice specifically requested the court to issue a corroboration charge to the jury, and the court declined to do so. Defendant points to a passage in the Supreme Court's opinion in Di Frisco which

24

states, "a defendant [is] <u>entitled to request and receive</u> a charge to the jury on its duty with respect to issues of corroboration."  118 N.J. at 274 (emphasis added).

The Court did not need to consider the impact of a requested corroboration charge in <u>Di Frisco</u> because the case involved a challenge to the outcome of a bench trial.  <u>See id.</u> at 274-75.  Corroboration charge requests were not made in <u>Reddish</u>, 181 N.J. at 621, or <u>Brooks</u>, 309 N.J. Super. at 57.  In <u>Reddish</u> and <u>Brooks</u>, the defendant was not granted a new trial on appeal because the omission of an unrequested charge as to corroboration was found to be inconsequential.  In <u>Reddish</u>, for example, the Supreme Court found that other aspects of the jury charge addressed the jury's responsibility to assess the "credibility of the defendant's statements," and the thrust of the defense in that case was that his statements to police were untrue.  181 N.J. at 622.

We agree with defendant the trial court erred in this case by declining to issue the requested charge on corroboration.  The court's ruling on the subject focused essentially on the admissibility of the telephone calls, sufficiently corroborated, to be considered by the jury.  That corroboration consists of such proof as the video surveillance footage, the red bag defendant is shown carrying on the video and seized from Shaffer's house, the pre-attack discussion with the

Salazars, and the unrebutted proof of defendant's motive to kill the victim as an act of retaliation or revenge from her testimony for the State at his previous trial.

The pivotal issue therefore is whether defendant is entitled to a new trial because of the omission of the corroboration charge. We do not think so. First, it is significant that Smith and most of the New Jersey cases cited in defendant's brief involving issues of corroboration of confessions involve an incriminating statement a defendant made to government or law enforcement officials. In such interactions, as the Court in Smith observed, there can be coercion or intimidation, and reliability of a confession may be suspect when "extracted from one who is under the pressure of a police investigation," which might cause an innocent person to provide a false confession. Smith, 348 U.S. at 153.

By contrast, defendant's repeated admissions of killing the victim here were made to his family members, in phone calls that he himself initiated. No one from law enforcement forced defendant to place those calls, or to make the admissions to his loved ones. The potential for government coercion was not present. He made the incriminating admissions, over and over again, to family members he himself chose to call.

To be sure, we recognize defendant could have been in a confused and in a stressful state of mind when he made those voluntary statements. But such a

benign explanation was advanced by defendant's counsel in her closing argument. The jury apparently found that explanation unconvincing.

Second, the prosecutor in this case did not argue or suggest in her own closing argument that the jury should convict defendant based only on his telephone admissions. The prosecutor stressed the State's other evidence, including Shaffer's testimony about defendant's conduct and his change of clothing at his sister's house, the red bag defendant took to Shaffer's house, the trash bag defendant carried out of his sister's house, the video surveillance footage, and the video-recorded encounter with the Salazars. Although we recognize there was no definitive forensic proof placing defendant in the victim's apartment, and the murder weapon was not found, there was ample independent proof that corroborated defendant's incriminating statements, and the prosecutor highlighted that evidence in her closing argument.

Third, as in Reddish and Brooks, other aspects of the jury charge provided guidance to the jurors concerning the need to consider carefully the credibility of defendant's statements, as with the testimony of the trial witnesses. Such a charge adhered to the precepts of State v. Hampton, 61 N.J. 250, 272 (1972), advising the jurors to disregard defendant's out-of-court statements if they found them not credible.

Under Rule 2:10-2, a defendant has the burden on appeal to demonstrate that a trial error was "clearly capable of producing an unjust result[.]" Having carefully considered his arguments in light of the record and the applicable law, we conclude he has not met that burden arising out of the lack of corroboration charge. Although that charge should have been given as requested, its omission does not require a new trial in the circumstances presented.

B.

We are not persuaded that a new trial is mandated by any of the remaining issues raised by defendant. Three of those issues concern decisions the trial court made with respect to the admissibility of evidence. Specifically, defendant argues the court erred in: (a) admitting photographs of the victim's body and of her apartment showing her wheelchair, walker, and photographs; (b) not adequately redacting his telephone conversations with his family members, in which he acknowledged or was criticized for various aspects of his past conduct and character; and (c) admitting the testimony of the Salazars, despite their inability to positively identify him as the person they spoke with outside the apartment building.

All of these evidentiary rulings involved the trial court's exercise of discretion. We owe general deference to the trial court on such evidentiary

rulings, we will not grant relief unless we conclude the court abused its discretion and, if so, "whether any error found is harmless or requires reversal." State v. Prall, 231 N.J. 567, 581 (2018). Guided by that standard, we discern no basis to grant defendant a new trial based on these evidentiary issues, whether they are considered singly or cumulatively. We add only a few brief comments.

The trial court did not abuse its discretion in admitting certain autopsy photographs and the photos showing the appearance of the victim's apartment. The autopsy photographs were relevant to show the manner of death, and to help the jury understand the coroner's expert testimony. Although defendant mainly contested his identity as the perpetrator of a murder, his trial attorney assented to an alternative passion/provocation manslaughter charge during the charge conference. The evidence in the March 27 telephone call suggesting that defendant may have been provoked to kill the victim in the heat of passion because she had disparaged him as being of Mexican heritage, provided a reason for the State to adduce proofs, such as the autopsy photos, to rebut such an alternative theory by showing the repeated stabbings were instead purposeful.

Nor do we detect an abuse of discretion in the court's admission of photographs showing the condition of the apartment. The fact that the victim was in poor health and used a wheelchair and a walker was arguably relevant to

show that the attacker readily overtook her and was able to inflict multiple stab wounds upon her in only a few short minutes. In sum, the court did not abuse its discretion under N.J.R.E. 403 in choosing not to exclude the photographs.

We likewise find no reversible error stemming from the lack of more extensive redactions to defendant's telephone calls with his family members. The court appropriately sanitized the conversations to omit references to defendant having committed a previous homicide. The references in the recorded exchanges with his family members about his past behavior provided context for the discussions. See N.J.R.E. 106 (the rule of completeness). The court also issued a detailed instruction to the jurors consistent with N.J.R.E. 404(b) admonishing them not to use the telephone evidence "to decide that the [d]efendant has a tendency to commit crimes or that he is a bad person." Instead, the jury was only permitted, as N.J.R.E. 404(b) allows, to consider that evidence as possible proof of defendant's motive to harm the victim. Again, we discern no an abuse of discretion, nor error "clearly capable" of producing an unjust conviction.

The trial court also did not misapply its discretion in allowing the jury to hear the testimony of the Salazars. There was sufficient rational circumstantial proof, including the video footage, that defendant was the person with whom

30

they spoke, despite their inability to identify him individually. The rule of authentication only requires a rational basis and circumstantial evidence, which were present here. See N.J.R.E. 901; State v. Hannah, 448 N.J. Super. 78, 89-90 (App. Div. 2016) (explaining authentication requires a prima facie showing of authenticity which can be made circumstantially). It was appropriately up to the jury to decide if, indeed, defendant was the person who approached the Salazars. See Konop v. Rosen, 425 N.J. Super. 391, 411 (App. Div. 2012). If defendant was found to have been that person, his out-of-court statements to the Salazars were admissible and probative as statements by a party-opponent. N.J.R.E. 803(b)(1).

Lastly, we discern no merit in defendant's speculative claim that one or more jurors might have seen him wearing an ankle bracelet in the courtroom during jury selection. The judge personally inspected the jurors' ability to have observed the bracelet, and saw no conclusive basis to conclude they would necessarily have seen it. In addition, the judge offered to issue a cautionary instruction, which defense counsel declined. The following day, the bracelet was placed on defendant's other leg, to minimize the chance of it being observed by jurors. There is no evidence that any juror saw the bracelet. The argument

31

for reversal on this basis is patently speculative and without merit. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2855-16T1